HUNTON ANDREWS KURTH LLP
JACOB J. STRUCK (State Bar No. 362712)
jstruck@hunton.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: 213 • 532 • 2000
Facsimile: 213 • 532 • 2020

KATHERINE P. DEEGAN (State Bar No. 301117)
kdeegan@hunton.com
50 California Street, Suite 1700
San Francisco, California 94111-4604
Telephone: 415 • 975 • 3700
Facsimile: 415• 975 • 3701

Attorneys for Plaintiff
Marisa Polvino, individually and derivatively as a member of OLF Productions, LLC

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

MARISA POLVINO, individually and derivatively as a member of OLF PRODUCTIONS, LLC;

Plaintiff,

v.

ANTHONY ROBBINS, an individual; TONY ROBBINS PRODUCTIONS, INC., a Delaware corporation; FOX CORPORATION, a Delaware corporation; MARVISTA ENTERTAINMENT, LLC, a Delaware limited liability company; FOX ENTERTAINMENT STUDIOS, LLC, a Delaware limited liability company KATE COHEN, an individual; RAX PRODUCTIONS LLC, a Delaware limited liability company; KCD MEDIA, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive,

Defendants,

Case No.

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:**

1. **BREACH OF CONTRACT**
2. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CAL. CORP. CODE § 17704.09)**
3. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
4. **FRAUD**
5. **AIDING AND ABETTING FRAUD**
6. **BREACH OF FIDUCIARY DUTY**
7. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
8. **BREACH OF DUTY OF LOYALTY**
9. **AIDING AND ABETTING**

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

and

OLF PRODUCTIONS, LLC, a California limited liability company,

*Nominal Defendant.*

**BREACH OF DUTY OF LOYALTY**

10. **INTENTIONAL INTERFERENCE WITH CONTRACT (DEVELOPMENT FINANCING AGREEMENT)**
11. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (PATERSON/MAYANK AGREEMENT)**
12. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (OPTION RENEWAL OPPORTUNITY)**
13. **DIRECT COPYRIGHT INFRINGEMENT**
14. **CONTRIBUTORY COPYRIGHT INFRINGEMENT**
15. **VICARIOUS COPYRIGHT INFRINGEMENT**
16. **CIVIL THEFT (CAL. PEN. CODE § 496(C))**
17. **CONVERSION**
18. **CIVIL CONSPIRACY**
19. **UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200)**
20. **NEGLIGENT MISREPRESENTATION**
21. **REINSTATEMENT TO ACTIVE STATUS (CAL. GOV. CODE § 12261)**

**DEMAND FOR JURY TRIAL**

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

## INTRODUCTION

1. This action arises from the collapse of a venture formed to bring Viktor Frankl's celebrated book *Man's Search for Meaning* ("MSFM" or "Book")—a book that has spent nearly eighty years teaching readers how to find meaning amid unimaginable suffering—to the big screen as a feature-length motion picture (the "Picture"). At the heart of the Book is the conviction that the primary human drive is not pleasure, but the pursuit of meaning. There is a painful irony in how the effort to bring that message to the screen has unfolded. A project built over years of long-standing loyalty, trust, and a shared commitment to bring an extraordinary work to the screen instead became the catalyst of disloyalty, concealment, and self-dealing. What followed was a campaign to wrest control of the project in which money, contracts, intellectual property, producing rights, and ultimately the Picture itself were stripped from the company that built them and from one of the producers who helped make the project possible.

2. Long before any studio joined the project, Plaintiff Marisa Polvino ("Plaintiff" or "Polvino") and Defendant Kate Cohen ("Cohen") began working on developing MSFM. Beginning in 2019, Alexander Vesely ("Vesely")—Viktor Frankl's grandson—joined them. Together, through OLF Productions, LLC ("OLF") and its predecessor, they secured and repeatedly extended the option for the motion-picture rights, commissioned screenplays, fostered creative and financing relationships, and raised and invested more than $1 million to develop the Picture.[1] OLF was formed and existed for one purpose: to acquire MSFM rights, develop them, own them, and produce the Picture. Those efforts included years of collaboration with Tony Robbins ("Robbins")—the globally-known motivational speaker and author—who helped develop and finance the Picture.

[1] The collective undertaking to bring the Picture to the screen is referred to herein as the "Project."

3. As part of those development efforts, Polvino, on behalf of OLF, secured an introduction to and developed a relationship with Fernando Szew ("Szew"), then the Chief Executive Officer of MarVista Entertainment, LLC ("MarVista"). Polvino pursued this relationship because she knew MSFM was a personal passion of his. Months of meetings and negotiations followed. In February 2024, Polvino's efforts paid off: MarVista joined the Project and entered into a Development Financing Agreement with OLF that MarVista itself helped draft (the "Agreement"). That Agreement created a joint venture in substance if not in name. Notably, it omitted the customary disclaimer that would have said otherwise and instead bore the hallmarks of a joint venture: shared financial investment at risk of loss, shared control, and a shared economic interest in the success of the Picture. Indeed, the Agreement imposed express, fiduciary-grade controls over development, production, and distribution activities related to the Picture. For example, both venture partners contributed to a $300,000 development fund ("Development Fund," and any portion thereof, the "Development Funds")—OLF's $100,000 share satisfied with funds from Robbins—to be held in a dedicated OLF-owned account at Chase Bank (the "OLF Account"). Both venture partners likewise held approval rights over every material decision related to the Project, and OLF retained ownership of the rights created through development of the Picture unless and until MarVista properly exercised a defined "Studio Option." And even in that instance, OLF was deemed the production company of record, with OLF retaining mutual approval rights over all business and creative matters, and tie-breaker rights over all creative matters. OLF and MarVista also each stood to participate financially in the Picture's success. The structure mattered. MarVista bargained to develop and produce *with* OLF, not around it. And neither MarVista nor its direct or indirect parent, Fox Corporation ("Fox Corp.") and eventually Fox Corp.'s subsidiary, Fox Entertainment Studios, LLC ("Fox Studios") arrived at the ground floor. They joined a project OLF had spent

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

years and over $1 million building, with existing investors willing to invest more, and then helped craft and direct how it would move forward.

4. Within months of the Agreement, what OLF had spent years building began to unravel. Cohen diverted more than $22,000 of OLF Development Funds to pay for personal and other expenses unrelated to the Project, closed the OLF Account, and transferred approximately $140,000 in remaining Development Funds to KCD Media, LLC ("KCD"), a company alleged upon information and belief to be wholly owned by Cohen, or another company she owned and/or controlled (a "Cohen Entity"). And the unauthorized use and transfer of money was only the beginning. Cohen also began moving other pieces of the Project outside of OLF and away from Polvino, including writer negotiations, development assets, and negotiations to renew the underlying motion-picture rights in and to the Book.

5. When Polvino confronted Cohen, Cohen flipped the script. To divert attention from her own misconduct, she began telling a new story—one in which Cohen had done nothing wrong and Polvino was not the victim, but the villain. Cohen told anyone who would listen—including MarVista, Fox Studios, and Fox Corp.—that Polvino and Cohen had agreed to dissolve their partnerships, including OLF; Cohen would control the Picture; and that Polvino agreed to surrender her role as a "Producer" on the Picture, along with the credit, compensation, profit participation, and deferred producing fees she would earn in connection with the joint venture.

6. But Cohen did not stop there. Most outrageous of all, she accused Polvino of embezzling $500,000 from another company the two women co-owned and claimed that Polvino had agreed to give up her rights in the Picture because of it. The narrative had all the makings of a juicy Hollywood scandal, except none of it was true. It was fiction: Polvino had agreed to give up nothing, and she had not embezzled a dime.

7. Whatever MarVista, Fox Studios, and Fox Corp. had been told by Cohen, any room for doubt disappeared on December 16, 2024. At that time, Polvino

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

put MarVista, Fox Studios, and Fox Corp. squarely on notice in writing through Ian Fried ("Fried") and Szew. Fried held himself out as the Head of Film Business and Legal Affairs and an agent for MarVista—the Agreement designated him as MarVista's notice recipient and he negotiated its terms—and, on information and belief, for Fox Corp. through its Fox Entertainment studios business, and eventually through Fox Studios as an entity, and had actual or apparent authority to oversee the Project's business and legal affairs.

8. Polvino emphasized to Fried that she had agreed to none of it: she had not surrendered her producer role, compensation, ownership or management rights, or participation in the Picture; the OLF Account had been closed without her knowledge; and the remaining Development Funds had been moved to a Cohen Entity. Fried acknowledged he had spoken to Cohen days earlier and that her version of events "did not sound right." At that point, Fox Corp., Fox Studios, and MarVista, through their agents Fried and Szew, knew there was a serious dispute over Cohen's authority to move OLF's money and rights outside the company, because Polvino had provided evidence that Cohen's actions violated the very Agreement they had negotiated and helped draft. That notice should cause a sophisticated entertainment company to pause, investigate, and protect the joint venture and its partner. MarVista, Fox Studios, and Fox Corp. did the opposite. Despite multiple written requests, MarVista, Fox Studios, and Fox Corp. did nothing to address Polvino's concerns. In fact, they did something worse: they bypassed OLF and continued developing the Picture with Cohen, Vesely, and Robbins, in breach of the Agreement, and to the complete exclusion of Polvino.

9. MarVista's participation in the venture was not passive. Its own business-affairs counsel negotiated writer deals for the Project on OLF's behalf. Yet counsel credited OLF's $62,500 payment toward a new agreement drafted for an unrelated company—an agreement intended to supersede OLF's existing contract with that same writer. Initially these writer negotiations began as an OLF transaction,



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

but when the deal was finalized, Cohen and MarVista placed the agreement in the name of a Cohen Entity instead of OLF. Same Project. Same writer. Same OLF-funded consideration. Different company on the contract—in direct violation of the Agreement. And MarVista's, Fox Studio's, and Fox Corp.'s representatives were driving the negotiations throughout.

10. But what MarVista, Fox Studios, and Fox Corp. were telling Polvino was markedly different from what they were actually doing. On January 21, 2025, Fried told Polvino in writing that, from MarVista's, Fox Studio's, and Fox Corp.'s perspective, "everything is on hold" as it relates to the Project until Polvino and Cohen resolved their dispute, and that MarVista, Fox Studios, and Fox Corp. were "not engaged in discussions about any other matters on the project." One week later, Fried reiterated that MarVista, Fox Studios, and Fox Corp. had not consented to the Project moving to a new entity or to any change in structure. Those assurances were false: development continued and the structure had changed. New screenplay material was written and reviewed at the direction of Cohen, MarVista, Fox Studios, and Fox Corp., development activities proceeded on the Picture in the name of a company other than OLF, and MarVista, Fox Studios, and Fox Corp. continued working with Cohen, Vesely, and Robbins. The Project was not on ice. Polvino was.

11. What happened next is telling. Robbins, no stranger to the Project, emerged as an active player in the scheme to ice out Polvino. For years, Robbins and his production company, Tony Robbins Productions, Inc. ("TR Productions"), worked side by side with Polvino, Cohen, and their production entities in developing and financing the Project pursuant to an arrangement under which Robbins and his entity would participate as 50% partners in the venture, including sharing in the economic benefits and profits generated by the Project. Robbins funded substantial development expenses, exercised approval and other producing rights over material development decisions and was designated as a producer under the Agreement. He knew how the Project had been built, he worked with Polvino and Cohen as OLF's

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

representatives and treated OLF as his co-venturer, he knew that OLF held the underlying motion-picture rights and helped finance the acquisitions of those rights, he knew that OLF was actively seeking to renew those rights, and knew Polvino and Cohen were active producers on the Project.

12. Everyone involved, including MarVista, Fox Corp., Fox Studios, and Robbins, knew the option to acquire the Book's motion-picture rights (the "Option") would expire less than eight months after the Agreement was signed. They even planned for that deadline: the approved development budget specifically set aside additional funds to extend the Option. Cohen began negotiating that extension on OLF's behalf over a month before the Option was set to expire on October 25, 2024, and Polvino initially participated in those negotiations, as she had throughout the prior eight years. Then, in early November, when she had been led to believe that the paperwork extending the Option in OLF's name was being finalized, she was cut out from those negotiations. Instead, she stopped receiving information about the negotiations and the Project altogether.

13. By December, MarVista, Fox Studios, and Fox Corp., through Fried, acknowledged to Polvino that the Option had expired. Yet, MarVista, Fox Studios, and Fox Corp. were still participating in the Project and continued to do so for months to come—a clear departure from industry custom and practice. Then, in July 2025, after having helped to draft the very condition it then invoked, Fox Corp., on behalf of MarVista, sent Polvino and Cohen an email notice claiming it had just become aware that OLF no longer controlled the Option. MarVista and Fox Corp. invoked that loss of rights as a basis for declaring OLF in breach and asserting that MarVista was free to negotiate with whoever now controlled the rights.

14. And who ultimately emerged from the scheme claiming control? Robbins, a venture insider, and close Cohen confidant, who knew OLF had held the rights, knew OLF was seeking to renew them, and who had helped develop the Picture as OLF's joint-venture partner. In January 2026, Robbins publicly stated that

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

he bought the rights to make the Picture and believes it can do as well as another movie he financed—*Sound of Freedom*—a movie that generated more than $250 million in worldwide box-office receipts.

15. The effort to move the Project outside OLF did not stop with its money, contracts, and development activities. OLF itself was the next target**.** On May 13, 2025, a Certificate of Cancellation was filed with the California Secretary of State stating under penalty of perjury that ***all*** OLF members had voted to dissolve the company. They had not. Polvino never voted to dissolve OLF, was never told it was being dissolved, and never authorized the filing. Yet the filing bore the electronic name of OLF's accountant as a purported manager/member. Polvino alleges, on information and belief, that the accountant's name to be used without OLF's authority. Less than two months later, a new entity bearing the same name—"OLF Productions, LLC"—was formed, again using the accountant's name as the person authorized to make the filing, but this time with only one unidentified member.

16. Which brings us to the present. Polvino and Cohen's partnership disputes are no more resolved today than they were in December 2024. Cohen's fabricated narrative about Polvino's supposed "embezzlement" found no support in fact. And despite what MarVista, Fox Studios, and Fox Corp. told Polvino, the Project was never put "on hold." Development activities on the Picture continued, as did Defendants' deceit and disloyalty, culminating in MarVista, Fox Studios, and Fox Corp. greenlighting production of the Picture, co-financing the production as planned, and producing the Picture alongside Cohen, Vesely, and Robbins. It is a Hollywood success story years in the making—for everyone but Polvino. Defendants now contend she has no role in, or right to share in, the success of a Project built on her many years of substantial work alongside each of them.

17. That is why Marisa Polvino is here. She brings this action to recover the money, rights, opportunities, credit, and value that were stripped away; to protect the copyrighted works and chain of title built through years of development; to restore

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

OLF to active status; and to hold each defendant accountable for their respective role in the scheme to take what was not theirs and profit from it as though she and OLF had never been part of it at all.

## JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, as Plaintiff derivatively seeks damages and injunctive relief for violations of the Copyright Act of 1976, 17 U.S.C. § 101, et seq.

19. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy as Plaintiff's federal claims.

20. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2). The events giving rise to this dispute occurred in substantial part in this District.

## THE PARTIES

21. Plaintiff Polvino is, and at all relevant times was, an individual residing and doing business in Los Angeles County, California, and is a Los Angeles-based film producer and media entrepreneur. Polvino holds a one-third membership interest in OLF.

22. Defendant Robbins is, and at all relevant times was, an individual residing in Florida and doing business in Los Angeles County, California, and is an author, motivational speaker, and business strategist. He has participated in the Project since approximately 2018, has financed its development since approximately 2020, and has been attached as a "Producer" of the Picture through today.

23. Defendant TR Productions is a Delaware corporation, and, upon information and belief, has its principal place of business in California. It is the media production house for Robbins' video, audio, and broadcast content, and, upon information and belief, the entity which financed the development activities for the Picture.

24. Defendant Cohen is, and at all relevant times was, an individual residing



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

and doing business in Los Angeles County, California. Cohen holds a one-third membership interest in OLF and acted as a manager of OLF. In the alternative, Cohen acted as OLF's agent for the specific tasks alleged herein.

25. Defendant RAX Productions LLC ("RAX") is a Delaware limited liability company with its principal place of business in Delaware which was formed by Cohen using OLF Development Funds.

26. Defendant KCD is a Delaware limited liability company. Upon information and belief, KCD has its principal place of business and substantial business operations in California and is wholly owned by Cohen.

27. Defendant MarVista is a Delaware limited liability company with its principal place of business in Los Angeles, California. Its acquisition was publicly announced in December 2021 and attributed to "FOX Entertainment." Fox Corp. subsequently reported MarVista and its related entities as consolidated subsidiaries in its Annual Reports on Form 10-K, including the report for the fiscal year ended June 30, 2026. On information and belief, Fox Corp. acquired MarVista directly or through one or more subsidiaries, and MarVista has at all relevant times been a direct or indirect subsidiary of Fox Corp.

28. Defendant Fox Corp. is a Delaware corporation with its principal place of business in New York and substantial business operations in Los Angeles County, California. Fox Corp. conducts its entertainment business under the trade name "FOX Entertainment," which is not a separate legal entity. Since at least March 2024, FOX Entertainment has been organized into three operating groups: FOX Entertainment Studios, the FOX Television Network, and FOX Entertainment Global. Fox Corp is sued for its own conduct. Fox Corp. conducts a "FOX Entertainment studios business" as described in its Form 10-K, through which it participated in the events alleged herein, including through MarVista, Fox Studios, and through Fried, who acted as agent for MarVista, Fox Studios, and Fox Corp. in negotiating and overseeing the Project's business and legal affairs.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

29. Defendant Fox Entertainment Studios, LLC ("Fox Studios") is a Delaware limited liability company with its principal place of business in Los Angeles. Its sole member is Foxcorp Holdings LLC ("Foxcorp Holdings"). Fox Studios is a subsidiary of Fox Corp. Fox Studios or a Fox Corp direct or indirect affiliate funded MarVista's $200,000 Contribution by wire transfer on or about March 16, 2024 and, on information and belief, employed key employees who engaged in the activities described herein at all relevant times. Fox Studios is pled in the alternative to Fox Corp. as it remained a business unit of Fox Corp. until it was formed as an entity on October 15, 2024.

30. Plaintiff further alleges, upon information and belief, that at all relevant times, the acts and omissions of MarVista and Fox Studios were ratified by Fox Corp., and at all relevant times, Fox Corp. aided and abetted the acts and omissions in proximately causing the damages herein alleged.

31. Nominal Defendant OLF Productions, LLC is a California limited liability company with its principal place of business in Los Angeles. Polvino, Cohen, and Vesely each hold a one-third membership interest in OLF. OLF's Articles of Organization designate its management structure as "One Manager." No manager was ever appointed, and OLF never adopted a written operating agreement. OLF's members agreed through their course of conduct that Cohen would serve as a manager under an implied operating agreement recognized by California Corporations Code § 17701.02(s). In the alternative, OLF's members conferred authority by consent to act on OLF's behalf through limited-scope agency assignments for specific tasks, rather than a general delegation of management authority.

32. Plaintiff is informed and believes, and on that basis alleges that Defendants Does 1 through 10, inclusive, are individually and/or jointly liable to Plaintiff for the conduct alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 10,

inclusive, are unknown to Plaintiff at this time. Accordingly, Plaintiff sues Defendants Does 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities once ascertained.

33. Plaintiff is informed and believes, and on that basis alleges that each of the Defendants is, and at all times relevant hereto was, the agent, servant, employee, shareholder, managing member, and/or joint venturer of each of the other Defendants, and performed the acts, matters, or occurrences alleged herein within the course and scope of their agency or contractual arrangements, and with the knowledge, authority and/or ratification of each of the other Defendants.

## **DERIVATIVE ACTION STANDING**

34. At all relevant times, Polvino was a member of OLF when each transaction challenged on OLF's behalf occurred and remains a member entitled to pursue OLF's claims. Polvino will fairly and adequately represent OLF's interests and those of similarly situated members, and this action is not collusive to manufacture federal jurisdiction. Fed. R. Civ. P. 23.1.

35. In December 2025, detailed written demand letters were sent by Polvino to Cohen and Vesely. Those written demands set out the ultimate facts underlying the derivative causes of action asserted on OLF's behalf, identified the challenged conduct and the persons and entities whose conduct forms the basis of those claims, and demanded corrective action and restoration of OLF's money, rights, and opportunities.

36. Plaintiff is unaware of any other manager of OLF to whom a written demand would be required other than Cohen. As detailed further, Viet Do was OLF's accountant, at no time relevant to Plaintiff's claims was a vote ever held for him to be a manager, and he was not a member at any time relevant to Plaintiff's claims.

37. Even in the absence of the December 2025 demands, demand on OLF's members or manager to bring the claims asserted against Cohen would be futile

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

because Cohen is an alleged wrongdoer, and Vesely has been complicit in her acts as demonstrated in his December 16, 2024 email, in which he responded to Polvino stating "[Cohen] did not act alone. I was and am aware."

38. Cohen and Vesely comprise two of OLF's three members. Requiring them to authorize OLF to sue themselves, or to authorize claims against persons and entities alleged to have acted with them, would not provide a disinterested decisionmaker.

**OLF'S MEMBERS AND COHEN'S MANAGEMENT OR AGENCY**

39. From May 2022 until approximately November 2024, Kate Cohen conducted OLF's business openly representing herself as a manager, with Polvino copied on her material communications, and no member of OLF objected to her authority. During this time frame, upon information and belief, no member of OLF informed any third party that Kate Cohen lacked authority to act on OLF's behalf.

40. For example, Cohen signed the assignment agreement between Our Little Fire and OLF as the assignee for OLF on May 12, 2022, the day that OLF was formed. Polvino's signature is also on the document, and thus she acquiesced to Cohen's exercise of authority.

41. Numerous third parties also dealt with Cohen as OLF's manager, and conditioned their actions upon her approval. In September 2024, Cohen led negotiations on behalf of OLF with Fox Entertainment and MarVista regarding writer agreements for the Picture. When the Frankl Estate requested documentation of OLF's rights in September 2024, Cohen directed Katie Menke, Creative Executive at Straight Up Films, to produce "the Assignment Agreement and the corporate documents for OLF Productions LLC" on OLF's behalf. Janet Savage of MarVista conditioned the commencement of OLF's writer negotiations on Cohen's approval of OLF's negotiating position, then proceeded with negotiations after Kate Cohen confirmed: "Let's begin negotiations." Dr. Roman Gruber, counsel for the Frankl

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

heirs, identified Cohen as OLF's representative in his October 10, 2024 correspondence, referencing "the option agreement entered into between them and a legal entity represented by you," and directed new proposed option terms to Cohen.

42. Cohen also had access and signing authority to the OLF Account as is evidenced by her transfer of $140,000 out of the account, as well as her closure of the account. Upon information and belief, these actions could only be undertaken with signer or online authority on OLF's account.

43. Polvino's and Vesely's authorization of Cohen's role as a manager of OLF was also reflected in the parties' conduct. Cohen copied both members on her correspondence with the Frankl Estate concerning renewal of OLF's Option Agreement. On October 10, 2024, she forwarded proposed terms authored by counsel for the Frankl Estate to both of them and requested a call among all three members before responding. Polvino made herself available to participate.

44. The authority to pursue these transactions for OLF did not include authority to move them outside OLF. Closing the OLF Account, transferring approximately $140,000 in Development Funds to a Cohen Entity, placing the Paterson/Mayank Agreement in a Cohen Entity's name, and diverting OLF's renewal or replacement option opportunity were outside the ordinary course of OLF's activities and required the consent of all members under California Corporations Code section 17704.07(c)(4). Polvino never consented to any of those acts.

45. In the alternative, if Cohen is not a manager of OLF, Polvino and Vesely each authorized Cohen to act as OLF's agent for discrete, limited purposes, including, but not limited to, executing the Agreement, leading negotiations to renew the Option Agreement, administering OLF's writer engagements, and using her signatory access to the OLF Account to make approved Project payments. Cohen accepted and undertook those assignments on OLF's behalf. Each authorization was confined to the task entrusted to her.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

46. The authority to pursue these transactions for OLF did not include authority to move them outside OLF. Closing the OLF Account, transferring approximately $140,000 in Development Funds to a Cohen Entity, placing the agreement for Lesley Paterson's and JS Mayank's writing services (the "Paterson/Mayank Agreement") in a Cohen Entity's name, and diverting OLF's opportunity to renew or replace the Option were outside the ordinary course of OLF's activities and required the consent of all members under California Corporations Code § 17704.07(c)(4)(B). Polvino never consented to any of those acts.

47. In accepting and performing these assignments, Cohen acted as OLF's agent. Within the scope of her agency, Cohen owed OLF duties of loyalty, disclosure, and accounting. Those duties required her to disclose material information concerning the assigned transactions, account for OLF property entrusted to her, and refrain from using her agency to divert OLF's property or opportunities for her own benefit. These duties arose from the assignments she undertook, not merely from her membership in OLF.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

## FACTUAL BACKGROUND

***2016-2024: The Origins of the Project and Robbins' Years as a Development Partner***

48. *Man's Search for Meaning*, first published in 1946, chronicles Viktor Frankl's experience as a prisoner in Nazi concentration camps and the philosophy of meaning he developed, which became the foundation of Logotherapy, a universally practiced form of psychotherapy. Translated into more than fifty different languages, it has sold approximately twenty million copies worldwide, and remains one of the most widely read works of the twentieth century.

49. Beginning in approximately 2016, Polvino and Cohen worked with the then-rights holders to develop a motion picture based on the Book. In 2019, when the motion-picture rights became available, Polvino, Cohen, and Vesely began pursuing those rights together with representatives of the Frankl Estate.

50. In July 2019, Polvino, Cohen, and Vesely formed Our Little Fire, LLC ("Our Little Fire") to develop and produce a film production based on the Book. Our Little Fire entered into an option/purchase agreement with the Frankl Estate dated April 15, 2019, to exclusively option, own, and control all motion-picture rights, among other rights, in and to the Book, with an option period commencing in January 2020 and was later extended through a series of amendments to on or about October 25, 2024 (that agreement, together with its three subsequent amendments, are referred to herein as the "Option Agreement").[2]

51. OLF was formed on May 12, 2022. Before Our Little Fire ceased operations, it assigned all rights in and to the Project, including the Option Agreement, to OLF. Cohen signed that assignment on OLF's behalf, one of the discrete, task-specific tasks the members authorized her to perform for OLF.

52. Before execution of the Agreement, Polvino, Cohen, and Vesely, through OLF and their respective affiliates, and their investors had raised and invested more than $1 million in development activities in connection with the Picture, including option fees, screenplay and writer expenses, consulting costs, Writers Guild of America ("WGA") related expenses, legal costs and development and presentation materials.

53. Among those who helped finance that development was Robbins, whose role extended well beyond funding. Beginning in approximately 2018, Robbins sought out Cohen and Polvino when he heard that they controlled the rights in and to the Book. Robbins publicly credits the Book as one of the keys to his success, and one of the most important influences in his life. Robbins worked closely with Polvino and Cohen to develop and produce the Project. Through TR Productions, or another

[2] Plaintiff uses October 25, 2024, as the operative expiration date of the last Option Period as that is the date Cohen has referenced in communications with the Frankl Estate. Due to the Covid pandemic and industry wide union strikes that took place during the exclusive Option Period, the Option was suspended and extended for the time period those events lasted. However, October 25, 2024, is, to the best of Plaintiff's knowledge, the date the Option expired.



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

entity he controlled (a "Robbins Entity"), Robbins provided substantial development financing and participated in material development activities, including the selection and engagement of writers, review of screenplay materials, and other producing activities.

54. In or about October 2018, when Robbins, through his counsel, Stephen Breimer ("Breimer"), began negotiating the terms of his participation with Polvino, Cohen, and their counsel. Robbins initially sought to co-own the Option, with those rights and all expenses shared 50/50, and sought to be attached as a producer. Rather than co-own the Option, the parties ultimately structured Robbins' participation as a joint venture with the Option holder.

55. Robbins and his counsel understood from the outset that the Option to the motion-picture rights was held by Our Little Fire. On May 15, 2020, Breimer acknowledged as much, inquiring how Robbins would be attached to the rights "given that the option is in OLF's [i.e., Our Little Fire's] name, only." He proposed either placing the rights in a company owned equally by a Robbins entity and Our Little Fire or agreeing that no action would be taken on the rights without Robbins' sign-off. Cohen responded that the parties preferred the latter approach. By May 20, counsel confirmed that "everyone has agreed re: 50/50 sharing of the development costs," and Cohen confirmed that all parties, "including Tony," had agreed to the writer deal terms.

56. Either directly or through his representatives, Robbins was actively involved with the day-to-day operations of the Project. By means of example, in January 2019, counsel to Our Little Fire, prior to making an offer to screenwriter Randall Wallace to adapt the Book into a screenplay, sought the approval and comment of Breimer, on behalf of Robbins, before sending out the offer. The offer that ultimately was sent reflected all of the changes Breimer suggested. After Polvino spoke with Robbins about next steps, the offer to Wallace was withdrawn, and Polvino worked with Solco Schuit, Robbins' agent at WME—who provided



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

development services on Robbins' behalf—to identify replacement writers. When press releases were prepared, Robbins' approved them through his PR agent. When stories ran in the press that did not accurately reflect Polvino, Cohen and Vesley as producing partners alongside Robbins, Robbins enlisted his PR agents to ensure a retraction and correction.

57. Through their respective attorneys, Polvino and Cohen, for Our Little Fire, and Robbins agreed that TR Productions would participate as a producing and financing partner with approval and other producing rights over material development activities, and responsibility for an agreed share of development financing.

58. In May 2020, Breimer, on behalf of Robbins, discussed forming a new limited liability company owned equally by a Robbins entity and Our Little Fire. On February 11, 2021 Robbins' counsel circulated a proposed operating agreement labeled "Tony Robbins-Joint Venture – California Operating Agreement." The draft contemplated shared ownership, development expenses, and approval rights over material creative and business decisions. Multiple drafts of the operating agreement followed. By March 2023, all material terms had been agreed to and the parties sought to "wrap up" the formal operating agreement. Although no final operating agreement was executed, Robbins and his representatives continued participating in and financing the Project as if its terms were operative.

59. This agreement was evidenced through the course of conduct over the years. Whenever a specific development need arose, Robbins, Cohen and/or Polvino would discuss the need. After discussion and approval by all, the development deal would be negotiated with the third party. Then, whenever OLF needed to make a payment under the applicable development agreement, OLF would generate an invoice which detailed what the funds were for, reflect Robbins' agreed share of the total cash need, and submit the invoice to Robbins through TR Productions or to Robbins' counsel. The requested invoice amount would then be paid by TR

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

Productions either directly or indirectly to OLF. Robbins' contributions were directed to Our Little Fire's bank account so that it would maintain control over the venture's funds. At times, payments to OLF were delayed when Robbins felt certain conditions had not been met, and he would remit the amounts later through TR Productions once he believed that the conditions had sufficiently been met.

60. The parties operated that joint venture for years. Robbins, directly or through his representatives, helped identify, select and engage writers, and reviewed screenplay materials. Robbins personally met with or took Zoom meetings with perspective writers to hear pitches on how they might adapt the Book.

61. Robbins, directly or through his representatives, approved material deal terms before offers were made, while TR Productions paid its agreed share of development expenses. In a May 14, 2020 email concerning screenwriter Angela Workman's engagement, Cohen described the arrangement as "50/50 partners" and explained that counsel were documenting it. Robbins' counsel questioned Workman's proposed fee, negotiated revisions to the net-profits language in her deal, and received her certificate of authorship for his "final approval." The producers' reading periods were made extendable to accommodate Robbins' schedule. In October 2020, Robbins authorized an $81,000 wire on the understanding that the funds would be held until both sides agreed to the next payment.

62. The parties followed the same process when engaging screenwriter David Aaron Cohen: Robbins' counsel received the deal terms, Robbins retained approval rights, and TR Productions was invoiced for its agreed share of the writer's fee and related pension, health and welfare contributions. Polvino, Cohen, and their production entities continued developing the Project with Robbins and TR Productions as their producing and financing partners.

63. Between 2020 and 2024, Robbins, through TR Productions, contributed approximately $430,325 toward Project development in at least seven separate wire transfers toward development of the Project. Examples include:

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

- **$81,000**: wired October 8, 2020.
- **$55,950**: his invoiced share of Workman's rewrite fee and related pension, health, and welfare contributions; invoiced February 18, 2021, and wired on or about March 10, 2021, as confirmed by counsel's office.
- **$100,000**: his invoiced share of David Aaron Cohen's fees; invoiced November 16, 2021.

64. By the time OLF entered into the Agreement with MarVista, Robbins had been involved in developing the Project for more than five years and was a driving factor when attracting creative talent and other development investors. Robbins was familiar with OLF's role as the vehicle through which the Project and its rights were being developed. Robbins also publicly acknowledged his involvement in the Project. In January 2021, he discussed developing a film adaptation of the Book during an interview on the Hollywood Raw podcast. A subsequent Page Six article, orchestrated by Robbins' PR representative, identified Robbins as having secured the motion-picture rights in partnership with Cohen, Polvino and Vesely.

65. Robbins remained actively involved in the Project thereafter, and the February 2024 Agreement with MarVista expressly identified him, along with Polvino, Cohen, and Vesely, as a producer of the Picture. Robbins involvement with the venture was a key reason why MarVista was interested in partnering with OLF.

66. Throughout this period, Polvino acted as a full "producer," and as one of the principal creative and business drivers of the Project. Polvino's central role was evident from the earliest stages of the Project. In January and February 2019, Polvino drove the search for a screenwriter, conferring directly with Robbins regarding next steps and working with Schuit, Robbins' agent, to identify and evaluate writer candidates. In the draft operating agreement circulated by Robbins' counsel for the contemplated joint company in February 2021, Polvino was designated as the jointly owned company's Partnership Representative for tax



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

matters. Polvino and Cohen had a separate standing arrangement between them regarding the Project, which remains in effect today, that compensation earned by them in connection with the Project would be shared equally and that any material terms related to their individual producing services would be on a most-favored-nations basis as between them.

***Fall 2023-February 2024: Polvino Brings the Picture to MarVista and OLF Enters into a Joint Venture***

67. In the fall of 2023, Polvino introduced the Picture to Szew, then MarVista's Chief Executive Officer and later (starting on or about March 27, 2024) head of Fox Corp.'s Fox Entertainment Studios business. Polvino understood that MSFM was personally meaningful to Szew, as his grandparents were Holocaust survivors, a fact Polvino knew and relied on in identifying MarVista as an ideal financing and production partner.

68. As Polvino got to know Szew through a series of meetings, she came to find out that he was seeking out a project that would define his legacy, and Szew identified MSFM as being that project.

69. Over the ensuing months, Polvino and Cohen, acting for OLF, negotiated with Szew, Fried, and Janet Savage ("Savage"), a Senior Vice President, Studio Business and Legal Affairs attorney for MarVista. Savage drafted and negotiated the Agreement on MarVista's behalf based on the material business terms she and Fried negotiated with Polvino and Cohen, and both worked with them to finalize it. OLF was not represented by independent legal counsel in the negotiation; instead, the document was negotiated directly by Polvino and Cohen, and, with the authorization of both Polvino and Vesely, Cohen executed the Agreement on OLF's behalf. Darrell Cross ("Cross") signed the Agreement on MarVista's behalf as MarVista's Chief Financial Officer.

70. MarVista and OLF entered into the Agreement, dated February 28, 2024 and countersigned by MarVista on March 8, 2024. *See* **Exhibit "1."** As conditions

precedent to MarVista's obligations under the Agreement, the parties required, among other things, MarVista's review and approval of the chain of title to the Picture—including, among other agreements, the Option Agreement, then set to expire on or about October 25, 2024—and MarVista's approval of a development budget, which included a $10,000 fee earmarked as consideration for extending the option period under the Option Agreement. All conditions precedent were satisfied and approved by MarVista in writing before execution of the Development Financing Agreement.

71. The Agreement required a development budget not exceeding $300,000 and provided for a $300,000 Development Fund consisting of $200,000 from MarVista, and $100,000 from OLF (satisfied with funds from Robbins). The parties agreed that the Development Fund would be used exclusively for customary development costs of the Picture and Development Funds would be deposited into, and at all times remain in, the OLF Account.

72. To receive the Development Fund investment from MarVista, OLF was required to create an account in Fox Corp.'s Coupa Supplier online portal. OLF was provided specific instructions to select "Fox Corporation" as the party to whom the $200,000 invoice should be directed to. On March 16, 2024 OLF received the $200,000 Development Fund investment referenced in the Agreement from a Fox Corp. direct or indirect subsidiary, a Fox Entertainment entity.

73. On information and belief, Fried acted on Fox Corp.'s and Fox Studios' behalf in negotiating the material points of the Agreement, serving as its notice designee, and receiving Polvino's December 16, 2024 notice. That attribution is supported by MarVista's status as Fox Corp.'s direct or indirect subsidiary, the Fox Corp.-affiliated funding, and Szew's and Fried's dual executive roles alleged above. The Agreement Fried negotiated also reserved exclusive worldwide distribution rights in the Picture and all its elements to Fox Entertainment Global, LLC ("FEG"), a Delaware limited liability company managed by Fox Corp., subject to MarVista-




HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

approved third-party equity or pre-sale arrangements entered into by OLF—further supporting the inference that Fried acted for Fox Corp., Fox Studios, as well as MarVista.

74. On information and belief, Cross likewise served both as MarVista's Chief Financial Officer and, beginning about June 2024, as Executive Vice President of Finance of Fox Corp.'s Fox Entertainment studios business, and later Fox Studios as an entity. Polvino alleges on information and belief that Fried's conduct, Szew's conduct in those dual roles, and Cross's conduct after June 2024 were undertaken for Fox Corp.; alternatively, for MarVista or both entities. Cross signed the Agreement solely on MarVista's behalf.[3]

75. The Agreement established OLF's development responsibilities and the parties' mutual control:

- **Development spending and engagements**. Paragraph 2(a) restricted the Development Fund to mutually agreed development activities, including completion of the screenplay, required pension, health, and welfare contributions, and production planning. Paragraph 2(c) required OLF to secure all rights and engage all necessary entities and individuals for those activities, and gave both parties approval over services and materials paid from the Development Fund.
- **Guild compliance**. The Agreement thus contemplated guild-related costs and OLF becoming a WGA signatory. It did not authorize Cohen to substitute a personally owned entity for OLF on the ground that a separate WGA-signatory entity was required.

76. The Agreement also defined the Studio Option and preserved OLF's role whether or not MarVista exercised it:

[3] The precise capacities in which these individuals acted are within Fox Corp.'s and MarVista's knowledge and control and cannot be determined before discovery. Plaintiff therefore pleads attribution in the alternative under Federal Rule of Civil Procedure 8(d)(2)–(3).

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

- **Studio Option**. MarVista received an exclusive option to elect to produce, finance, and own the Picture, exercisable during the 180 days following approval of the Script's second draft, but only if MarVista had sourced or committed at least 20% of the Picture's equity financing and committed to produce it.
- **Ownership before exercise**. Unless and until MarVista exercised the Studio Option, Paragraph 8 preserved OLF's sole ownership of all intellectual property conceived, created, developed, acquired, and expressed during development of the Picture and all subsequent productions derived from it, subject to MarVista's distribution rights.
- **Production after exercise**. Upon exercise, Paragraph 5(a) assigned the Picture's rights to MarVista, but Paragraph 5(b) retained OLF as production company of record under a production services agreement to be negotiated consistent with MarVista's standard form, provided to OLF before execution (the "PSA"). Paragraph 5(c) preserved mutual creative and business approvals with specified tie-break rights, and Paragraph 5(d) named Polvino, Cohen, Vesely, and Robbins as producers, consistent with Robbins' longstanding producing role and financing through TR Productions.

77. The Agreement provided corresponding economic benefits and expressly identified Polvino as a beneficiary of certain promises:

- **Net profits.** Upon exercise of the Studio Option, Paragraph 5(f) allocated net profits equally between OLF and MarVista, subject to defined fees and recoupment terms.
- **Producing compensation.** OLF's production services fee would satisfy the fixed producing compensation payable to Polvino, Cohen, and Vesely. Under their standing agreement, Polvino and Cohen would

share Project compensation equally and together receive most of that fee.

- **Deferred compensation and personal rights.** Paragraph 5(g) provided a one-time aggregate payment of $500,000 to OLF for Cohen's and Polvino's benefit, allocated as OLF determined (the "OLF Deferment"). Their standing equal-sharing agreement entitled Polvino to half of that payment and her agreed share of other compensation, subject to the applicable contractual conditions. Her producer-credit and OLF Deferment rights were separate from OLF's ownership of Project assets and contractual rights.

78. MarVista retained substantial control over revenues, financing, and distribution even without exercising the Studio Option:

- **Revenue administration.** If MarVista remained an investor without exercising the Studio Option, Paragraph 7 required an independent collection agent jointly appointed by OLF and MarVista under a written agreement to which both were parties to administer 100% of gross receipts. All third-party distributors and sales agents would be jointly instructed to remit directly to that agent, and disbursements required joint approval.
- **Financing and distribution.** MarVista retained approval rights over third-party financing and rights agreements, including sales of distribution rights before exercise of the Studio Option and after expiration of the Studio Option Period. Upon exercise, Paragraph 5(e) granted FEG exclusive worldwide distribution rights, subject to MarVista-approved third-party equity or pre-sale arrangements entered into by OLF. If OLF retained distribution rights, Paragraph 9 gave MarVista a reasonable first and exclusive opportunity to acquire them.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

79. These provisions (as well as Fried's role) made MarVista, Fox Studios, and Fox Corp. partners in directing the venture, not merely a source of financing. MarVista, acting for itself and as Fox Corp.'s agent and co-venturer, bargained for joint control over development, production, and the revenue stream that flowed from the Picture. The Agreement had no fixed term and preserved OLF's central role in either outcome: ownership before exercise of the Studio Option and production after exercise. Nothing in the Agreement authorized MarVista, Fox Studios, Fox Corp or Cohen to circumvent OLF by transferring its development rights or its production role to another entity. The Agreement contains no provision contemplating, and no mechanism permitting, a third outcome in which the Picture is produced by an entity other than OLF while OLF holds neither the production role nor ownership of the rights in the Picture, including but not limited to the rights in and to Book. This contract structure demonstrates the MarVista's, Fox Corp's and Fox Studios' path to producing the Picture ran through OLF, not around.

***November 2023-September 2024: OLF Engages the Writers, Funds the Screenplay, and Delivers the Materials to MarVista***

80. In November 2023, following a meeting with Cohen and Robbins, OLF selected Oscar-nominated writer Lesley Paterson ("Paterson") and her husband and writing partner, Simon Marshall ("Marshall"), to adapt the Book for the screen. Marshall was diagnosed with stage-four pancreatic cancer later that same day. A former psychology professor who had taught the Book for years, Marshall, with Paterson—who lives by Frankl's mantra that the life you choose to focus on is the life you experience—persevered in their goal to finish the adaptation against insurmountable odds.

81. OLF entered into a written agreement with Brave Art Entertainment LLC ("Lender") dated as of December 6, 2023 for Paterson's and Marshall's writing services (the "Paterson/Marshall Agreement"). Before signing the Agreement, MarVista had already approved Paterson and Marshall as the writers contemplated



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

by Paragraph 2(c) and reviewed and approved the Paterson/Marshall Agreement in its chain-of-title diligence.

82. The Paterson/Marshall Agreement guaranteed a first draft, second draft, and polish. The first-draft compensation was $125,000, payable one-half on commencement and one-half on delivery. On or about March 14, 2024, OLF paid the first $62,500 installment to commence services under the Paterson/Marshall Agreement.

83. The Paterson/Marshall Agreement's standard terms define the "Work" as all results and proceeds of the writers' services, provide that OLF is the sole and exclusive owner of that material, treat the Work as work-made-for-hire, and contain a present assignment of the writers' rights, including copyright, for any portion not deemed work made for hire.

84. On June 1, 2024, Marshall passed away before he and Paterson delivered the contractually guaranteed first draft, ending his ability to render further writing services. But the Paterson/Marshall Agreement did not provide that his death automatically terminated Paterson's engagement, divested OLF of rights in work Paterson thereafter rendered, or transferred OLF's writer relationship to another producer.

85. OLF did not send Paterson or the Lender a written suspension or termination notice under the Agreement, and Polvino is unaware of any written termination, mutual cancellation, assignment, or signed modification of the Paterson/Marshall Agreement after Marshall's death and before Paterson's August 2024 submission. Instead, Paterson continued developing the screenplay for OLF. On August 29, 2024, she submitted a 39-page first act to OLF (the "Paterson First Act Materials"), which therefore constituted Work under the Paterson/Marshall Agreement and are owned by OLF.

86. By September 12, 2024, OLF had provided MarVista with the Paterson First Act Materials, describing them as Paterson's "most recent pages" for MSFM.

Cohen told MarVista Paterson had "just turned in" the pages, called them "fantastic," and explained they resulted from Paterson's conversations with prospective co-writer JS Mayank ("Mayank") and "our guidance"—i.e., guidance OLF personnel provided. Polvino was copied on this entire exchange as a "producer" and OLF creative team member.

87. In a September 12, 2024 email, Hannah Pillemer ("Pillemer"), Head of Scripted Content for Fox Studios, asked whether Mayank had "pitched an outline" or whether there was "a road map for the work they are planning to do." In response, Fox Studios again received the Paterson First Act Materials, which Cohen explained arose from conversations between Paterson and Mayank. MarVista used the Paterson First Act Materials to evaluate and approve their proposed screenplay direction and Mayank's engagement as Paterson's new co-writer.

88. Contemporaneous records confirm Paterson's work remained tied to her existing OLF engagement. Negotiations for a new contract for Paterson's and Mayank's services commenced on or around August 30, 2024. In a September 3, 2024 exchange on Paterson's proposed new deal, Cohen expressly referenced "Lesley's original deal," identified the first-draft fee as $125,000, and acknowledged "We already paid 50% of this to Lesley to commence her."

89. MarVista, through Savage, continued negotiating the Paterson/Mayank Agreement on OLF's behalf. On September 24, 2024, Savage circulated "our point of view for OLF's response" to Mayank's counterproposal and described certain terms as "the current deal between OLF and Lesley." The proposed agreement repeatedly identified OLF as the contracting party. In the same period, after obtaining internal approval, Savage wrote to Cohen for OLF, "Let's begin negotiations," dealing with Cohen as OLF's representative.

90. The proposed agreement provided for a $125,000 first-draft fee, with the first $62,500 installment identified as "Paid to Lesley," reflecting what OLF had already paid under the Paterson/Marshall Agreement, and provided that the new

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

agreement would supersede all prior agreements between OLF and Paterson. The arrangement thus both credited OLF's prior payment and contemplated replacing OLF's existing writer agreement.

91. On September 25, 2024, Savage asked whether OLF or another entity would be the contracting party, writing to Cohen: "Since this will be a WGA deal, please confirm whether the contracting party will be OLF, or a different company. We don't want to cause you possible guild issues by making the offer in the name of a non-WGA company." Savage asked because, having drafted the Agreement, she knew OLF or an OLF-owned subsidiary had to become a WGA signatory before executing the Paterson/Mayank Agreement. Although the Agreement contemplated guild-covered writers and associated expenses, it did not authorize Cohen to transfer OLF's writer relationships or development rights to an entity she personally owned.

92. Polvino does not possess the executed Paterson/Mayank Agreement. But Cohen admitted in December 2024 that "the writers have a deal with my signatory company," Mayank's attachment was publicly announced in March 2025, and Cohen acknowledged receiving their screenplay draft on April 29, 2025. Based on those facts, Polvino alleges on information and belief that the Paterson/Mayank Agreement was executed on terms materially consistent with those described above, but named a Cohen Entity—not OLF—as the contracting party. On information and belief, Savage drafted it for MarVista knowing that the Agreement required OLF or an OLF-owned WGA signatory to contract for those services.

93. Plaintiff is unaware of any amendment, assignment, modification, release, or novation authorized by OLF transferring its rights under the Paterson/Marshall Agreement, its $62,500 payment credit, or its ownership of the existing work product to a Cohen Entity. The diversion was not a mere bookkeeping choice: under the Agreement, OLF was responsible for securing rights and engaging development personnel, and Paragraph 8 preserved OLF's ownership of intellectual property created during development unless and until MarVista exercised the Studio



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

Option. By placing the Paterson/Mayank Agreement with a Cohen-controlled WGA signatory rather than OLF, Defendants diverted the contractual relationship and the resulting work away from the only entity entitled to those rights: OLF.

***April-December 2024: Cohen Diverts the Development Funds***

94. Cohen had access to the OLF Account to make approved Project payments. She used that access to transfer the remaining balance—approximately $140,000—to an account outside OLF and close the OLF Account. Her authority to administer approved payments did not authorize the transfers, closure, or use of OLF funds for personal or non-Project purposes.

95. Throughout 2024, Cohen caused more than $22,000 of the Development Funds to be transferred or paid to satisfy expenses that, upon information and belief, were personal to Cohen or unrelated to approved Picture development. Examples include:

- A total of $17,000 in six separate bank transfers initiated by Cohen from the OLF Account to Straight Up Impact, LLC ("SUI") between June 2024 and September 2024 to satisfy Cohen's personal overhead obligations to SUI;
- a $741.58 Zelle payment to her husband, Trevor Davis, on April 5, 2024;
- a total of $1,000 in separate payments to Cohen's personal Chase credit card ending in 7165 on July 10, 2024; July 22, 2024; and August 14, 2024;
- a $500 Venmo payment to herself on August 2, 2024;
- $229 to Harvard Business Services for the formation of RAX, an entity that, upon information and belief, is controlled by Cohen; and
- a $990 Zelle payment to Viet Do, personally, on December 6, 2024 for activity unrelated to OLF.

96. Beginning in approximately October 2024, Polvino asked Cohen for receipts, invoices, and documentation to support these and other questionable transactions conducted through the OLF Account. Cohen refused to provide a

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

complete reconciliation, did not provide requested backup documentation for the expenses, and instead offered only partial explanations.

97. On December 11, 2024, Polvino accessed the OLF Account online to prepare financial reporting information and update books and records.

98. On December 12, 2024, Polvino discovered she no longer had access to the OLF Account. That same day, a Chase business banker confirmed in writing that Cohen had closed the OLF Account and transferred the balance, approximately $140,569.38 in two separate online transactions to an account ending in 1005, upon information and belief owned by KCD.

99. Polvino immediately confronted Cohen, who acknowledged that the Development Funds had been transferred to a Cohen Entity. At the same time, Cohen acknowledged that the Paterson/Mayank Agreement was entered into in the name of that Cohen Entity and that the writers would therefore be paid from its account. Cohen further claimed that Polvino had previously agreed to this arrangement.

100. Polvino had not agreed to any such arrangement. Although Polvino and Cohen had discussed the need for a WGA-signatory entity in October 2024 (as would be required under the Agreement to engage Mayank, a WGA writer), Cohen had not disclosed at that time that she intended to use an entity she personally owned and controlled.

101. Polvino immediately objected, explaining that any new WGA-signatory entity had to be owned by OLF to comply with the Agreement and that she had never authorized Cohen to enter into the writers' agreement through her own entity, close the OLF Account, or transfer the remaining Development Funds to an account in the name of a Cohen Entity.

102. Vesely was copied on the December 2024 email exchange. On December 16, 2024, he responded: "[Cohen] did not act alone. I was and am aware."

103. The Development Funds remain unreconciled. To the extent any portion was used to pay Paterson, Mayank, or others for development activities, those

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

expenditures were made using OLF's funds while the resulting contractual rights and work product were claimed by a Cohen Entity, and OLF is the rightful owner of those contracts, benefits, and rights. To the extent the funds were retained or spent for purposes unrelated to the Picture, OLF is entitled to their return.

***September-November 2024: Cohen Diverts OLF's Option-Renewal Opportunity***

104. The Option Agreement was scheduled to expire on or about October 25, 2024. MarVista knew that date from its chain-of-title review and knew an extension was part of the development plan because they approved a development budget that included an option renewal fee of $10,000 prior to entering into the Agreement.

105. With the authorization of both Polvino and Vesely, Cohen led negotiations with the Frankl Estate to renew or extend the Option Agreement on OLF's behalf, and she copied Polvino and Vesely on negotiations conducted through email correspondence with members of the Frankl Estate. Those negotiations began on September 20, 2024, writing to an Estate member in part:

> "As you may know, we have been working very closely with [Alex] Vesely and our screenwriter on the adaptation and we have recently received the first 40 pages of the screenplay [i.e. the Paterson First Act Materials]. We feel we are in the best place we have ever been with the script and are very excited by the direction. Alex has been a fantastic partner, working alongside us every step of the way. Our hope is to have a screenplay by the end of the year which we can use to attach a director, and then cast."

Cohen then offered to renew the option for an additional 18-month period for $10,000. With more than a month remaining before the Option was to expire, there was ample time to complete an extension that the parties had completed several times before in far less time.

106. In October of 2024, and prior to the expiration of the option on October 25, 2024, Polvino pressed Cohen on the status of negotiations with the Frankl Estate



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

in a verbal conversation with her, and expressed concern that the option was not yet extended. Cohen reassured Polvino that "all will be cool."

107. When the Frankl Estate asked why Our Little Fire no longer existed, OLF personnel provided the assignment documents to demonstrate that the rights in and to the Option Agreement had been transferred to OLF. That correspondence further reflects that the Option renewal negotiations were then being pursued as an OLF transaction.

108. By October 10, 2024, the Frankl Estate had retained Dr. Roman Gruber of Arnold Rechtsanwälte GmbH ("Estate Counsel") as legal counsel to renegotiate the renewal terms of the Option Agreement, and he forwarded a set of revised material terms. In his email, Estate Counsel specifically referred to a request to enter into an entirely new option agreement. Polvino was not copied on that correspondence and had not been informed of any such request. Estate Counsel communicated with Cohen, describing the renewal as concerning "the option agreement entered into between them and a legal entity represented by you."

109. Then, in an October 10 email, Estate Counsel told Cohen a new agreement was not necessary and instructed the parties to keep the existing Option Agreement in place and amend it only where necessary. In the same email, Estate Counsel also proposed that the parties:

- increase the proposed option fee to EUR 35,000 (approximately $39,000 (US));
- reset the purchase-price floor and ceiling to EUR 325,000 and EUR (approx. $364,000) and 650,000 (approx. $728,000), respectively;
- not offset the Option fee against the purchase price; and
- review the definition of net proceeds to clarify uncertainties.

He then asked Cohen to prepare a markup of the existing Option Agreement reflecting all amendments "deemed necessary," after which he would "immediately discuss the markup with his clients and get back to you as soon as possible." Based





HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

on that correspondence, Polvino is informed and believes that Estate Counsel intended to preserve OLF's existing contractual relationship with the Frankl Estate either through an amendment of the Option Agreement, or replacing it with a new agreement with OLF using the same long form agreement which had been previously negotiated.

110. Cohen immediately forwarded Estate Counsel's email to Polvino and Vesely and requested a call among all three members. Polvino prioritized the conversation and made herself available. Instead, Cohen had a phone call with Vesely alone, excluding Polvino.

111. Cohen then texts Polvino stating that she has spoken to Vesely, and she and Vesely are going to speak to Vesely's sister, and "it should be all good." Polvino's belief at the time was the option renewal was guaranteed given the parties involved, how much time, money and effort she, Cohen and Vesley had invested over the years, and the Fox relationship they had recently brought to the table.

112. Plaintiff is informed and believes that on October 10, Cohen purposely excluded Polvino from that call, intending to begin formulating a plan with Vesely to divert the Option Agreement negotiations away from OLF.

113. Then, on October 17, 2024, Cohen works to arrange a meeting between Szew and Robbins, stating that "she just heard back from Tony . . . . He really wants to meet you and was wondering if you can meet in LA in the next few weeks for lunch or dinner."

114. On October 25, 2024, the very day the Option Agreement was set to expire, Szew,[4] on behalf of Fox Corp. (and/or MarVista, Fox Studios, or all of them), travelled to Vienna to visit Elly Frankl, Viktor Frankl's wife, Vesely and other members of Frankl Estate.

[4] On March 27, 2024, Szew, then MarVista's Chief Executive Officer, was named Head of Fox Entertainment Studios, with oversight of MarVista and other Fox studio businesses.

115. On October 26, 2024, Szew sent Cohen, Polvino, and other Fox personnel emails with photographs of his visit with the Frankls, writing that he was "Honored to be part of this journey," indicating that MarVista, Fox Studios, and Fox Corp. still regarded the Project—and Polvino's work on the Picture—as active.

116. On October 28, 2024, Cohen and Polvino exchanged texts about establishing a WGA-signatory company and renewing the Option. Cohen did not disclose her intent to use a Cohen Entity as the WGA signatory.

117. Based on this exchange, Polvino was led to believe that the Option Agreement was either being extended, or that a new option agreement based on the same long-form agreement with Estate Counsel's revised terms was being entered in OLF's name, and that those negotiations were finalizing.

118. After November 4, Polvino was excluded from all further discussions regarding the Option Agreement renewal—negotiations in which she had been included since 2019, when the original Option Agreement and each amendment were negotiated. Polvino is informed and believes that Cohen, while serving as OLF's lead negotiator, deliberately concealed the status of negotiations and the identity of the proposed contracting parties. On information and belief, Cohen and Vesely redirected OLF's renewal or replacement option/purchase opportunity to a Cohen Entity, Robbins, or a Robbins Entity, with MarVista's, Fox Studios', and Fox Corp.'s knowledge and assistance. If Cohen had not already exceeded her limited authority as OLF's agent, diverting the very opportunity she was entrusted to pursue for OLF unmistakably crossed that line.

119. Cohen exploited OLF's development work, screenplay progress, Frankl Estate negotiations, and relationships with MarVista, Fox Studios, and Fox Corp. to pursue the underlying motion-picture rights outside OLF, through a Cohen Entity or by facilitating their acquisition by Robbins or a Robbins Entity. She sought to justify Polvino's exclusion with false embezzlement accusations and claims that Polvino had agreed to relinquish her interests in OLF and the Picture and dissolve their

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

partnership. Polvino further alleges on information and belief that Vesely, MarVista, Fox Studios, and Fox Corp. knowingly assisted and enabled Cohen in continuing development of the Project outside OLF and excluding both OLF and Polvino.

120. Cohen likewise used the communications, account access, funds, and relationships entrusted to her as OLF's agent to divert writer engagements, development payments, and Option renewal negotiations—and their resulting rights and benefits—to herself or other entities.

121. MarVista, Fox Studios, and Fox Corp. knew the Option Agreement expired on October 25, 2024, yet continued approving financing and developing the Picture with Cohen and Vesely outside OLF for eight months before Fox Corp., on behalf of MarVista, sent its July 16, 2025 breach notice (the "Fox Breach Notice"). A studio would be unlikely to continue those activities without having secured the underlying rights or an arrangement with whoever controlled them. The Breach Notice's suggestion that the expiration had only then "come to" their attention was false: Fried expressly acknowledged it in his December 17, 2024 email.

122. Based on that continued participation, Polvino alleges on information and belief that, well before the Fox Breach Notice, MarVista and Fox Corp. had an agreement with the party or parties securing or controlling the rights—Robbins, TR Productions, and/or a Robbins Entity, acting alone or in privity with a Cohen Entity.

123. MarVista, Fox Studios, and Fox Corp. continued providing their approval of additional financing of, and participation in, development activities after the Option Agreement's expiration supports a reasonable inference that they knew the rights had been or were being secured outside OLF, and were in privity with the party or parties who controlled those rights.

124. The Fox Breach Notice sent in July 2025 is written as if the expiration of the Option had only then "come to" MarVista's and Fox Corp.'s attention. This serves as another example of misrepresentation on the part of MarVista and Fox



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

Corp. Fried's December 17, 2024, email expressly acknowledges that he knew the Option had expired.

125. Upon information and belief, and based on the circumstances described above, Plaintiff alleges that MarVista, Fox Studios, and Fox Corp. had an agreement with the party or parties who controlled the rights well before the Fox Breach Notice, and that such party or parties were Robbins, TR Productions, and/or a Robbins Entity, acting alone or in privity with a Cohen Entity.

***MarVista, Fox Studios and Fox Corp. Are Fully Advised of Cohen's Misconduct by December 2024, Lie to Polvino Saying the Project is On Hold, But Continue Development Outside of OLF***

126. Indeed, on December 13, 2024, Polvino called and emailed Szew requesting an urgent call to discuss Cohen's admission that she had closed the OLF Account and transferred the Development Funds to a Cohen Entity, Cohen's questionable transactions, and Polvino's concern that Cohen had diverted OLF's rights and the Option renegotiation to a Cohen Entity. On December 16, Szew directed her to Fried, who was gathering information for MarVista, Fox Studios, and Fox Corp. leadership.

127. On the same day, Polvino sent Fried, copying Szew, a detailed written account of the questionable OLF transfers for Cohen's personal expenses, Cohen's refusal to provide supporting documentation, the OLF Account closure, the transfer of approximately $140,000 in Development Funds, and Cohen's admission that the remaining Development Funds were moved to a Cohen Entity with no legal relationship to OLF or the Project.

128. Later that day, on December 16, during a phone call with Polvino, Fried disclosed that he had spoken with Cohen three days earlier. According to Fried, Cohen claimed Polvino had agreed to dissolve their partnership, withdraw from her producer role and day-to-day involvement, and accept ten percent of Cohen's producing fees—payable only if the Picture was made—as her sole compensation for

more than eight years of work. Polvino unequivocally denied agreeing to any such arrangement.

129. Polvino further explained that she and Cohen had reached no agreement to dissolve their other partnerships or divide their assets. Nor had she agreed to dissolve OLF or relinquish her ownership, management, producer-credit, or compensation rights. She reaffirmed her role as a full producer and demanded continued inclusion in all Project discussions and activities. Fried acknowledged that Cohen's account "did not sound right" and that he would not have accepted the proposed arrangement himself. Polvino also expressed concern that the Option Agreement had expired and that Cohen had acquired, or was acquiring, the Book's rights through an entity other than OLF. In response, Fried confirmed the expiration and acknowledged that steps were being taken to secure a new option agreement.

130. By December 16, 2024, MarVista, Fox Studios, and Fox Corp., through Fried and Szew, had written notice that Cohen had closed the OLF Account, transferred the Development Funds, and diverted OLF's contractual rights without Polvino's approval. Polvino expressly denied authorizing those acts or surrendering her interests. They nevertheless continued dealing with Cohen despite notice that her authority did not extend to those transfers and structural changes.

131. The next day, in a December 17, 2024 email, Fried confirmed that he knew the Option Agreement had expired but had not seen a signed replacement. He said the "situation"—which Polvino understood to mean her partnership dispute with Cohen—"needs to be resolved for the good of the project" and would follow up with Cohen on how to proceed.

132. On December 23, 2024, Fried wrote that he had spoken with Cohen, told her the issues needed to be worked out so there was a clear path forward, and expected Cohen or her attorney to contact Polvino regarding a mutually beneficial arrangement.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

133. On January 17, 2025, Polvino emailed Fried that Cohen's proposal to resolve the partnership dispute was unacceptable, reiterated that she remained a full producer, demanded recovery of the $140,000, and repeated her concern that Cohen had moved the Option to a Cohen Entity. Fried responded that MarVista, Fox Studios, and Fox Corp. supported the parties' efforts to reach a solution but did not address any of Polvino's specific concerns.

134. On January 20, Polvino wrote to Fried that resolution of the partnership dispute would take time and that Cohen had unilaterally removed her from writer negotiations and ongoing development, leaving Polvino without visibility into liabilities and decisions affecting the Picture.

135. On January 21, 2025, Fried responded in writing: "I want to make sure you understand that from our perspective everything is on hold until the two of you are able to reach a resolution. We are not engaged in discussions about any other matters on the project and have asked that this be resolved as swiftly as possible." (emphasis added).

136. On January 28, 2025, Fried made a second significant representation. When Polvino asked whether an interim arrangement could be explored, Fried wrote that MarVista, Fox Studios, and Fox Corp. were "in the same position you are as we did not consent to the project moving to a new entity or any change in structure." (emphasis added).

137. Fried's statements are powerful because they acknowledge the premise Plaintiff alleges throughout this Complaint: moving the Project to a new entity was a material structural change requiring consent by the parties to the Agreement, not an administrative change caused by WGA signatory status. Polvino relied on his representation that MarVista had not consented as confirmation that the Agreement's structure—and OLF's ownership rights in the Picture—remained intact.

138. Fried's assurances were false or materially misleading when made. Before, during, and after those exchanges, MarVista, Fox Studios, and Fox Corp.




HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

actively supported and participated in development and production activities outside OLF, including drafting and completing the Paterson/Mayank Agreement in the name of a Cohen Entity; reviewing and providing notes on screenplay drafts written by Paterson and Mayank under the Paterson/Mayank Agreement and a separate draft by Cohen (the "Cohen Draft") 5; and packaging, financing, and production activities related to the Picture outside of OLF. On information and belief, MarVista also helped approve and draft the Paterson/Mayank Agreement in a Cohen Entity's name, continued engaging the Frankl Estate, and coordinated writing and development with Cohen and Vesely. Also, on information and belief, Fried personally knew of, oversaw, or participated in those activities as the Head of Business and Legal Affairs and agent overseeing the Project's business and legal affairs for MarVista, Fox Studios, and/or Fox Corp. To the extent conducted outside OLF, those activities breached the Agreement.

139. Polvino relied on Fried's repeated assurances that development was frozen while she attempted to resolve her internal disputes with Cohen. She also continued to engage the Fox Defendants as though they remained neutral parties pending resolution of Cohen and Polvino's disputes. The Fox Defendants knew that Polvino and Cohen did not resolve their partnership dispute. Fried, by his own admission, was in direct communications with Cohen, knew exactly when Cohen's counsel offered offers in those settlement discussions, and from Polvino's emails, knew no settlement had been reached.

140. Beyond providing creative, legal, and financial support to Cohen outside OLF after December 16, MarVista, Fox Studios, and Fox Corp. took deliberate measures to exclude Polvino before and after that date, including by:

[5] One or more drafts of the screenplay written by Paterson and Maynak under the Paterson/Mayank Agreement, the Cohen Draft, together with other works based on or created from OLF owned material, are referred to as the "Unauthorized Derivative Works."



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

- removing her from the Savage email correspondence on the Paterson/Mayank negotiations after she had been included for over a month;
- removing her from the screenplay review and comment process for the Paterson/Mayank work and the subsequent Cohen Draft and all other creative materials created thereafter in connection with the Project;
- removing her from packaging and financing activities such as those with the Harbor Fund (discussed below); and
- removing her from all other creative and business matters, when before November 2024 she had been involved in all such activities.

141. On May 9, 2025, Polvino told Fried she had learned development had in fact continued and a new screenplay draft had been delivered despite no resolution between her and Cohen. She again demanded inclusion in all development and production as a full producer, asked Fried to inform other MarVista, Fox Studios, and Fox Corp. personnel and interested parties to communicate the same, and requested a call with Fried and Szew to update her on the Picture. MarVista, Fox Studios, and Fox Corp. refused the call.

142. MarVista, Fox Studios, and Fox Corp. never restored Polvino's producer status or participation. Instead, they continued developing, financing, packaging, and advancing the Project with Cohen, Vesely, Robbins, and others outside OLF, treating Cohen as authorized despite Polvino's repeated objections and Fried's acknowledgment that Cohen's account "did not sound right."

143. On July 18, 2025, Michael Kaiser, Fox Corp.'s Vice President of IP and General Litigation, sent the Fox Breach Notice on MarVista's behalf. It stated that OLF's option lapse had "come to our attention," breached OLF's representations and warranties, and rendered its performance legally impossible. The notice also reserved MarVista's right to negotiate with whoever held the requisite rights. Yet Fried had

expressly acknowledged the expiration on December 17, 2024, and both entities had continued development with Cohen, Robbins, and Vesely for months afterward.

144. The notice thus cast the lapse as an intervening event rather than an outcome MarVista and Fox Corp. had helped bring about. It formalized their continued pursuit of the Project outside OLF with Cohen, one or more Cohen Entities, Robbins, and others controlling rights that belonged, or should have belonged, to OLF.

145. In June 2026, Polvino spoke with Lindsay Hadley ("Hadley"), CEO of the Harbor Fund, in connection with other social-impact projects she was producing. Hadley acknowledged the Harbor Fund is a co-financier of the Picture and confirmed it was headed into production in Fall 2026. Hadley was surprised to learn Polvino was a producer, telling her that none of the materials the Harbor Fund received from MarVista, Fox Studios, and Fox Corp. or Cohen identified Polvino as involved in the Picture, let alone as a producer.

146. Plaintiff further alleges on information and belief that one or more defendants changed the Picture's IMDb page to remove Polvino's producer credit—a credit accorded her for several years on IMDb and other industry websites.

***May 2025-August 2026: Cohen Cancels OLF and Forms a New Entity Bearing the Same Name in Its Place***

147. On May 13, 2025, a Certificate of Cancellation for OLF ("Certificate") was electronically filed with the California Secretary of State at 1:06 p.m. It states that dissolution was approved by a vote of all members and bears the electronic name "VIET X DO" on the line designated for a "Manager/Member Signature." Do was OLF's outside accountant and not an OLF member or manager.

148. Polvino, a member of OLF, never voted to dissolve or cancel OLF and thus the Certificate's express representation of unanimous member approval is materially false.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

149. At 11:56 a.m. on May 13, 2025, Polvino wrote in an email to Do that "OLF Productions LLC is still active and a return needs to be done." At 12:41 p.m., Do responded that he was on vacation through Memorial Day, that the return was on extension, and that he or someone in his office would work on the returns when the final documents were ready. The cancellation was filed approximately twenty-five minutes later.

150. Plaintiff is informed and believes, and on that basis alleges that Cohen caused the Certificate to be prepared and filed and caused Do's name to be placed on the electronic filing without his authority.

151. Polvino learned of OLF's cancellation on or about August 26, 2026.

152. After uncovering the cancellation of OLF, Polvino discovered that a new "OLF Productions, LLC" ("OLF #2") was formed by "Viet Do" as a single-member limited liability company two months after the cancellation of OLF and yet failed to file a Statement of Information as required within ninety days of forming a new entity, which was uncharacteristic of Do's prior work.

153. Plaintiff is informed and believes, and on that basis alleges, OLF #2 was formed by Cohen or someone acting on her behalf.

154. Submitting false documents to a public office (such as the California Secretary of State) is a felony under California Penal Code Section 115.

155. On information and belief, Cohen or someone acting on her behalf formed OLF #2 to facilitate chain-of-title review required by MarVista's, Fox Studio's, and Fox Corp.'s decision to greenlight the Project. Cohen then executed quitclaims and assignments through OLF #2, after which the July 2025 Fox Breach Notice was sent to Cohen and Polvino.

***2026: Robbins Emerges Holding the Rights to the Project He Helped Build***

156. Years of financing and developing the Project with Polvino, Cohen, and their entities gave Robbins and TR Productions firsthand knowledge of OLF's rights and role. Robbins knew OLF held the Option, was the entity through which the

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

Picture was being developed and produced, owned the development materials, and was the contracting party to the Agreement, and that Polvino was an OLF principal and producer. His own counsel had acknowledged in May 2020 that the Option belonged solely to Our Little Fire, OLF's predecessor.

157. Their joint development and financing arrangement continued after OLF's formation in May 2022 and its acquisition of the Option Agreement. These post-formation payments and producing activities carried forward the joint venture with OLF as its rights-holding participant:

- Robbins participated directly in the November 2023 meeting with Paterson and Marshall, and the decision to engage Paterson and Marshall;
- the February 2024 Agreement named him as a producer alongside Polvino, Cohen, and Vesely.
- On December 15, 2023, TR Productions contributed the $100,000 for the Project which satisfied OLF's commitment under the Agreement.
- On June 5, 2024, TR Productions contributed another $30,000 directly to OLF.

158. In a January 2026 podcast interview, Robbins publicly stated that he had acquired the Book's motion-picture rights and was making the Picture. Those were the same rights OLF had held and sought to renew, central to the parties' development and financing arrangement and the proposed jointly owned entity, MSFM Productions 2020, LLC, which was never formed. Polvino alleges on information and belief that Robbins acquired the rights directly, through a Robbins Entity, or in privity with a Cohen Entity, coordinating with Cohen or her entity after Cohen excluded Polvino from the Option renewal negotiations and purposely allowed the Option to expire only to divert the same rights to a Cohen Entity and/or a Robbins Entity. On information and belief, Robbins had sought those rights since

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

at least 2020 and knew Cohen was misrepresenting OLF's and Polvino's positions during the renewal period.

159. By July 2026, Polvino had learned through the Harbor Fund and other industry contacts that the Picture was financed and expected to enter production in Fall 2026, with MarVista, Fox Studios, Fox Corp., and the Harbor Fund among the reported financiers. On information and belief, Robbins or a Robbins Entity also continued participating in its financing and production. Cohen, Robbins, and Vesely remained identified as producers; Polvino remained excluded.

160. Neither the Option's expiration nor OLF's cancellation stopped development. The same Picture is moving toward production as of the date of this filing with the same participants, using the development work, rights, and relationships built through OLF—but without OLF or Polvino.

***2024-Present: Harm to OLF and Polvino***

161. The Picture did not cease development when OLF's option expired or OLF was cancelled. Instead, the same Picture continued to be developed and financed, and is now, on information and belief, proceeding toward production with the exact same participants without Polvino and OLF, using the development work, rights and relationships established over years through OLF.

162. As a result of Defendants' conduct, OLF has been deprived of Development Funds, writer contracts, development assets, and opportunities relating to the Picture. OLF has also lost the economic benefits it was entitled to receive under the Agreement, including its ownership and participation rights, production-related compensation, and contingent economic interests in the Picture.

163. Polvino has suffered separate injuries, including the loss of her contractual producer credit, exclusion from creative and business decisions concerning the Picture, and deprivation of compensation and economic benefits to which she was personally entitled, including her share of producing fees, deferred compensation, and contingent participation in the Picture.




HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

164. OLF and Polvino have also incurred expenses investigating the diversion of Development Funds, contracts, and development assets, and taking steps to preserve their respective rights and interests in the Picture.

**FIRST CAUSE OF ACTION**

**Breach of Contract**

**(By Polvino Derivatively on Behalf of OLF and Polvino Individually Against MarVista)**

165. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

166. OLF and MarVista are parties to a valid and enforceable written Agreement.

167. OLF performed all conditions, covenants, and promises required of it under the Agreement, or was excused from further performance by MarVista's own prior material breaches described herein.

168. The Agreement required, among other things, that:

a. Development Funds be maintained in an OLF-owned account and used exclusively for mutually agreed development activities;

b. OLF would secure and own all rights and engage all mutually approved personnel rendering development services in connection with the Project, and such contracts would be entered into in the name of OLF;

c. OLF would own all intellectual property rights created in connection with the development of the Project unless and until MarVista properly exercised the Studio Option;

d. upon exercise of the Studio Option, OLF would remain the Picture's production company of record under a PSA to be negotiated consistent with MarVista's standard form;

e. Polvino would receive producer credit under Paragraph 5(d), subject to that provision's stated conditions; and

f. development decisions would be subject to the parties' joint approval.

169. MarVista breached the Agreement by advancing development and/or production activities through a Cohen Entity or another entity in place of OLF. Specifically, MarVista authorized, assisted, approved, or accepted development services outside OLF; negotiated, through its business and legal-affairs personnel, the Paterson/Mayank Agreement that diverted OLF's contractual rights, credit for its prior payment, and writer relationships to another entity; and conducted packaging, financing, and production planning outside OLF. MarVista continued those activities after receiving Polvino's actual notice of the unauthorized diversion, depriving OLF of its bargained-for ownership, approval, accounting, and economic benefits.

170. MarVista further breached the Agreement by proceeding as though another entity had replaced OLF while representing that it had not consented to any structural change and that development was on hold. MarVista then excluded OLF, the sole owner of the development intellectual property, and Polvino from further development and worked through another entity to develop and produce the Project.

171. MarVista cannot invoke OLF's failure to maintain the Option as grounds for excusing its own performance, as asserted in the Fox Breach Notice, to the extent MarVista's prior material breaches contributed to that failure. Paragraphs 5(b) and 8 preserved OLF's production role and ownership rights, respectively, subject to their stated conditions. By facilitating development and production through another entity while excluding OLF from its bargained-for rights and benefits, MarVista undermined the Agreement.

172. Polvino asserts her individual claim solely as an intended third-party beneficiary of provisions expressly intended for her benefit: producing fees and other benefits under the PSA contemplated by Paragraph 5(b), producer credit under





HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

Paragraph 5(d), and the OLF Deferment under Paragraph 5(g), each subject to its stated conditions.

173. As a direct and proximate result of MarVista's breaches, OLF suffered damages to be proven at trial, including lost Development Funds; loss of ownership and control of development assets created both before and under the Agreement; impaired chain of title; lost development-related economic benefits and opportunities; and other foreseeable losses.

174. Polvino separately suffered damages from the loss of her intended contractual benefits and seeks compensatory damages according to proof and an accounting.

175. The Agreement authorizes prevailing-party costs and reasonable attorneys' fees in disputes arising out of or relating to it. Polvino seeks those amounts to the extent OLF or Polvino is entitled to enforce that provision and qualifies as a prevailing party.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

## SECOND CAUSE OF ACTION

**Breach of the Implied Covenant of Good Faith and Fair Dealing (Cal. Corp. Code § 17704.09)**

**(By Polvino Individually and Derivatively on Behalf of OLF Against Cohen)**

176. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

177. California Corporations Code 17704.09 provides that members and managers of a manager-managed limited liability company must discharge the duties to a limited liability company and the other members consistent with the obligation of good faith and fair dealing. That obligation applied to Cohen in all events and does not depend on whether she was a manager.

178. Cohen, as a member and manager of OLF, was required to discharge her duties to OLF and its members consistent with the obligation of good faith and fair dealing as codified in California Corporations Code Section 17704.09.

179. Cohen violated the covenants of good faith and fair dealing toward OLF by using her signatory bank account access to divert Development Funds to satisfy personal obligations and transfer OLF's remaining funds to KCD or another Cohen Entity; redirecting the Paterson/Mayank negotiations and the economic credit for OLF's $62,500 payment to Paterson to a Cohen Entity; causing the resulting writer rights and work product to be claimed outside OLF; and diverting the renewal or replacement option opportunity she had undertaken to pursue for OLF. She concealed material information concerning those transactions and failed to provide a complete accounting of the OLF funds entrusted to her.

180. Cohen breached that obligation, and caused injury to Polvino individually that is separate and apart from any injury to OLF, by excluding Polvino from the governance of, and access to information concerning, OLF after November 2024; by causing a Certificate of Cancellation to be filed that falsely represented Polvino's consent to dissolve OLF; and by causing a new "OLF Productions, LLC" (OLF #2) to be formed in OLF's place, displacing Polvino's membership interest and her role in the enterprise.

181. As a direct and proximate result of Cohen's breach of the implied covenant, OLF has suffered damages in an amount to be proven at trial, including loss of Development Funds, loss of ownership and control over assets (including the value of those developed in collaboration with MarVista and the ones developed prior to the Agreement), impaired chain of title, lost development and production economics, lost economic opportunities and other foreseeable losses.

182. As a direct and proximate result, Polvino has suffered damages according to proof, including the loss of her governance and information rights and the impairment of her membership interest, in an amount to be proven at trial.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

## THIRD CAUSE OF ACTION

**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(By Polvino Derivatively on Behalf of OLF Against MarVista)**

183. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

184. The Agreement, like every contract governed by California law, contains an implied covenant of good faith and fair dealing. That covenant obligated MarVista not to do anything that would unfairly frustrate OLF's right to receive the benefits of the Agreement. It also obligated MarVista to exercise the approval and other discretionary rights the Agreement conferred on it in good faith and consistent with the parties' agreed common purposes.

185. The Agreement's common purpose was to develop and produce the Picture with and through OLF—not around it. The Agreement required that OLF control the Development Funds, engage development personnel, and participate in material decisions. It also preserved OLF's ownership of intellectual property created during development unless and until MarVista exercised the Studio Option. If MarVista exercised the Studio Option, OLF would serve as the production company and receive 50% of net profits, subject to the Agreement's terms; otherwise, OLF would retain its development intellectual property, with continued joint economic participation contemplated under Paragraph 7.

186. OLF reasonably expected that MarVista would exercise its approval and discretionary rights to advance that agreed structure, not transfer the Project's benefits to another entity while leaving OLF without either its ownership or production role.

187. MarVista instead used its approval rights and legal-affairs personnel to divert OLF's writer relationship and development work. On September 24, 2024, Savage circulated "our point of view for OLF's response" concerning the

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

Paterson/Mayank engagement. The proposed agreement identified OLF as the contracting party, credited its prior $62,500 payment to Paterson, and would supersede its existing writer agreement. The next day, Savage asked whether the contracting party would be "OLF, or a different company." On information and belief, she thereafter drafted the agreement in a Cohen Entity's name despite knowing, from her role drafting the Agreement, that the engagement belonged with OLF. OLF's Paterson First Act Materials were meanwhile supplied to Fox Studios and Fox Corp. and used to evaluate and approve Mayank's participation. MarVista thus helped redirect an OLF-funded engagement and its resulting benefits to a Cohen Entity.

188. MarVista continued that course after receiving actual notice of the diversion. On December 16, 2024, Polvino informed Fried, MarVista's designated notice recipient, and Szew in writing of Cohen's questionable personal expenditures, closure of the OLF Account, and transfer of approximately $140,000 in Development Funds to her own company. Polvino also denied agreeing to surrender her rights in the Project, and Fried acknowledged that Cohen's account "did not sound right." Rather than address the diversion, MarVista continued advancing the Picture with Cohen and Vesely outside OLF and treating Cohen as authorized despite Polvino's objections.

189. MarVista concealed its continued activity through false assurances. On January 21, 2025, Fried stated that "everything is on hold" and MarVista, Fox Studios, and Fox Corp. were "not engaged in discussions about any other matters on the project." On January 28, he stated that they "did not consent to the project moving to a new entity or any change in structure." Yet before, during, and after those assurances, MarVista and Fox Corp. supported development outside OLF, including the Unauthorized Derivative Works and continued dealings with the Frankl Estate. On information and belief, Fried knew of, oversaw, or participated in those activities.

Relying on his assurances, Polvino continued treating MarVista, Fox Studios, and Fox Corp. as neutral while seeking a resolution with Cohen.

190. Even after Polvino learned that development had continued and renewed her demands for inclusion on May 9, 2025, MarVista, Fox Studios, and Fox Corp. declined her requested call and continued developing, financing, and packaging the Picture without OLF or Polvino.

191. Fox Corp. and MarVista then invoked the loss of rights its own conduct had helped bring about. Before entering the Agreement, it approved the Option's October 25, 2024 expiration date through its chain-of-title review and approved a budget earmarking $10,000 for an extension. Fried acknowledged the expiration in writing on December 17, 2024. Nevertheless, after months of continued development outside OLF, MarVista and Fox Studios, through Fox Corp., asserted in Fox Breach Notice that the lapse had "come to our attention," rendered OLF's performance legally impossible, and entitled MarVista to negotiate with whoever held the rights.

192. Even if MarVista could otherwise invoke the lapse, it did so in bad faith: it used a condition it had knowingly helped bring about to justify continuing the same Project with Cohen, Robbins, and others while excluding Polvino and OLF. MarVista, Fox Studios, and Fox Corp. thereafter developed, greenlit, and co-financed the Picture alongside Cohen, Vesely, and Robbins, without OLF.

193. This was conscious and deliberate conduct, not honest mistake, poor judgment, or negligence. MarVista knew the structure it had drafted, helped move an OLF-funded writer engagement to a Cohen Entity, continued after receiving actual notice, concealed ongoing development, and invoked a long-known option lapse to justify bypassing OLF.

194. In doing so, it unfairly frustrated the Agreement's common purpose and deprived OLF of its reasonably expected benefits: control of its funds, writer relationships and development work, intellectual-property ownership, joint approval




HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

rights, and the opportunity to serve as production company and receive its contractual share of profits upon MarVista's exercise of the Studio Option.

195. This claim is pleaded in the alternative to the First Cause of Action. It is based on MarVista's bad-faith exercise of its contractual discretion, misleading assurances, and reliance on a condition it helped create to deprive OLF of the Agreement's benefits. Such conduct breached the implied covenant independently of whether it also violated an express provision of the Agreement.

196. As a direct and proximate result of MarVista's breach of the implied covenant, OLF has suffered damages in an amount to be proven at trial, including loss of Development Funds, loss of ownership and control over assets (including the value of those developed in collaboration with MarVista and the ones developed prior to the Agreement), impaired chain of title, lost development and production economics, lost economic opportunities and other foreseeable losses.

## FOURTH CAUSE OF ACTION

**Fraud**

**(By Polvino Individually and Derivatively on Behalf of OLF Against Fox Corp., Fox Studios, MarVista, and Cohen)**

197. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

### A. Cohen

198. Cohen owed OLF and its members a fiduciary duty, including to disclose material facts concerning the transactions she undertook as a manager: (i) executing the Agreement, (ii) administering writer engagements, (iii) making approved Project payments, and (iv) negotiating renewal or replacement of the Option Agreement. That duty included disclosing any proposed use of OLF's funds, contracts, work product, or renewal opportunity for herself or another entity. Alternatively, the members' course of conduct alleged above established an implied operating agreement under which Cohen served as OLF's agent and owed duties of



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

disclosure to OLF and its members, including Polvino. Cohen also communicated directly with Polvino about those transactions while withholding facts necessary to make her disclosures non-misleading.

199. Project-related Concealment. Cohen concealed the following material facts during identified dealings with Polvino:

200. Beginning in approximately October 2024, Cohen responded to Polvino's requests for receipts, invoices, and an accounting of questionable OLF Account transactions with incomplete records and partial explanations, concealing the payments' personal or non-Project purposes.

a. During their October 28, 2024 texts about a WGA-signatory company and Option renewal, Cohen concealed her intent to use her own company rather than OLF or an OLF-owned entity. In December, she admitted that "the writers have a deal with my signatory company" and that the remaining Development Funds had been transferred to a Cohen Entity to pay them – both acts that breached the Agreement, were purposely concealed and done not in the best interest of OLF or its members, but done for the benefit of Cohen and/or a Cohen Entity.

b. After requesting an October 10, 2024 call among all three members about Estate Counsel's renewal terms, Cohen spoke with Vesely alone. When Polvino followed up with Cohen, Cohen told her "all should be good." After November 4, she excluded Polvino from renewal discussions and concealed their status and proposed contracting parties. On information and belief, Cohen and Vesely diverted that opportunity to a Cohen Entity, Robbins, or a Robbins Entity.

c. Cohen further concealed the lack of authority for those changes by falsely telling Fried, on or about December 13, 2024, that Polvino

had agreed to dissolve their partnership, relinquish her producer role and day-to-day participation, and accept ten percent of Cohen's producing fees.

These facts concerned ownership and control of the funds, writer rights, and renewal opportunity Cohen had been entrusted to pursue or administer for OLF. They also intended to defraud Polvino of her personal rights and compensation in the Project.

201. When Polvino verbally pressed Cohen about the pending extension in October 2024, before the October 25 expiration, Cohen reassured her that "all will be cool." That assurance, followed by their October 28 texts about renewal and Menke's texts, on information and belief, at the direction of Cohen, about the Estate's need for documents to complete the renewal, conveyed that Cohen continued pursuing rights for OLF without disclosing an adverse contracting arrangement. On information and belief, Cohen knowingly withheld the facts described above to induce Polvino to continue assisting OLF's development and renewal efforts without challenging the diversion. Her knowledge and intent are supported by her personal control of the account transactions, participation in the Paterson/Mayank and Estate negotiations, refusal to provide complete records, and December admission that the funds and Paterson/Mayank agreement had been placed with her own company. Cohen's deception lay in her misleading reassurance, which effectively concealed the adverse arrangement—not merely in the Option's later expiration.

202. Polvino, individually and acting for OLF within her authorized role, did not know Cohen intended to place the writer engagement and renewal opportunity outside OLF. Relying on Cohen's disclosures and omissions, she continued assisting renewal on the understanding that rights were being secured for OLF. On November 4, 2024, she supplied OLF's formation and related documents in response to Menke's urgent text request that "the Estate needs to see it urgently for the new option."



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

203. Had Cohen disclosed the adverse arrangements, Polvino would have objected to replacing OLF, withheld assistance benefiting another entity, and contacted Estate Counsel and MarVista directly to clarify Cohen's limited authority and protect OLF's rights and renewal opportunity. Cohen's concealment delayed that intervention while she advanced those transactions outside OLF, contributing to OLF's loss of control over its rights and opportunities and Polvino's exclusion from her producing role and personal economic benefits.

204. OLF's Cancellation. On information and belief, Cohen or someone acting on her behalf caused the unauthorized May 13, 2025 cancellation alleged above and concealed it from Polvino, who had expressly sought to keep OLF active that day and did not discover the filing until on or about August 26, 2026. On information and belief, Cohen meanwhile formed OLF #2 under the same name and used it for quitclaims and assignments facilitating the Project outside OLF. Had Cohen disclosed the filing, Polvino would have promptly challenged it and sought restoration of OLF's active status. Concealment delayed Polvino's challenge and allowed the cancellation and purported new entity to remain unchallenged while Cohen used that structure to advance the Project outside OLF.

205. OLF's resulting injuries include diverted Development Funds and loss of contractual and development rights and opportunities; Polvino's separate injuries include deprivation of her personal producer credit and compensation, in amounts according to proof.

**B. MarVista, Fox Studios, and Fox Corp.**

206. On information and belief, Fried and Szew acted for Fox Corp.; alternatively, for MarVista, Fox Studios, or all entities. Within his actual or apparent authority over the Project's business and legal affairs, Fried received Polvino's notices and made the representations below on those entities' behalf. His partial disclosures required disclosure of the continued development and changed structure necessary to make his statements non-misleading. Alternatively, as OLF's joint



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

venturers, MarVista, Fox Studios, and Fox Corp. owed OLF a fiduciary duty of full disclosure.

207. Fried made two specific written representations to Polvino: (i) on January 21, 2025, that "everything is on hold" and they were "not engaged in discussions about any other matters on the project"; and (ii) on January 28, 2025, that they had not consented to moving the Project to another entity or changing its structure.

208. Those statements were false or materially misleading when made. MarVista's personnel had helped negotiate and draft the Paterson/Mayank Agreement in a Cohen Entity's name, and MarVista, Fox Studios, and Fox Corp. continued supporting development outside OLF while excluding Polvino. Through her December 2024 notices to Fried and Szew, both entities knew that she had not authorized (i) the account closure and transfer of Development Funds, (ii) the diversion of OLF's contractual rights, or (iii) her removal from the Project as a producer; and (iv) her waiver of her rights and compensation as a producer under the Agreement. Fried himself acknowledged that Cohen's account "did not sound right."

209. On information and belief, Fried knew development continued through his oversight of the Project's business and legal affairs. Fried acted as agent for MarVista, Fox Studios, and Fox Corp. in negotiating and overseeing the Project's business and legal affairs. His knowledge, acquired within the scope of his agency, is imputed to the entities he represented and purported to work directly for.

210. Polvino reasonably relied on those assurances by continuing to pursue an internal resolution with Cohen and treating MarVista, Fox Studios, and Fox Corp. as neutral, believing development had stopped. By May 9, 2025, she learned it had continued and again demanded participation.

211. As a direct and proximate result of Defendants' fraud and misrepresentations, Polvino and OLF suffered damages according to proof.





HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

212. Defendants' conduct was fraudulent, malicious, and oppressive because they knowingly misrepresented that development was on hold while advancing the Project outside OLF, intending to deprive Polvino and OLF of their rights, property, and economic interests. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

## FIFTH CAUSE OF ACTION

### Aiding and Abetting Fraud

### (By Polvino Individually and Derivatively on Behalf of OLF Against MarVista, Fox Studios, and Fox Corp.)

213. Plaintiff Polvino incorporates the allegations in Paragraphs 1 through 220 as though fully set forth herein.

214. Cohen committed the fraud alleged above by concealing the diversion of OLF's funds, the Paterson/Mayank Agreement, and Option renewal opportunity while purporting to act for OLF. She concealed from Fried her lack of authority to take those actions by falsely representing that Polvino had agreed to relinquish her producing role and participation. Those concealments induced Polvino, individually and acting for OLF, to continue assisting transactions she understood benefited OLF and delayed her intervention against their diversion.

215. On information and belief, Fried and Szew acted within their authority over the Project for Fox Corp.; alternatively, for MarVista or both entities. Their receipt of Polvino's notices, knowledge acquired in those roles, and conduct below are attributable to the entities they represented. Polvino pleads attribution in the alternative because their precise capacities are within Defendants' knowledge and control.

216. MarVista and Fox Corp. actually knew of Cohen's fraud no later than December 16, 2024. That day, Polvino emailed Fried, copying Szew, detailing (i) Cohen's questionable expenditures and refusal to provide records; (ii) her unauthorized closure of the OLF Account and transfer of approximately $140,000 to



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

a Cohen Entity; and (iii) her admission that the Paterson/Mayank Agreement and the Remaining Development Funds had been placed with her own company. During their call that day, Fried relayed Cohen's claim that Polvino had agreed to withdraw as producer and accept reduced compensation. Polvino unequivocally denied consenting or surrendering her rights, and Fried acknowledged that Cohen's account "did not sound right." On information and belief, those disclosures, their own participation in the writer transaction, and Fried's continuing communications with Cohen established actual knowledge of concealed, unauthorized adverse arrangements—not merely a disagreement among members.

217. With that knowledge, MarVista, Fox Studios, and Fox Corp. intentionally and substantially assisted Cohen's continuing fraud by: (i) supporting writing and development through the Cohen Entity, including the Paterson/Mayank screenplay and Cohen Draft, while excluding OLF and Polvino from the work and decisions; (ii) continuing creative review, packaging, financing, and production planning with Cohen and Vesely outside OLF; and (iii) concealing those activities through Fried's January 21, 2025 written assurances that "everything is on hold" and they were "not engaged in discussions about any other matters on the project," followed by his January 28 representation that they had not consented to a new entity or structural change.

218. On information and belief, Fried knew development continued through his oversight of the Project's business and legal affairs. These affirmative acts advanced Cohen's adverse actions against OLF and concealed their implementation, rather than merely failing to investigate or intervene. On information and belief, MarVista, Fox Studios, and Fox Corp. provided that assistance to facilitate development through Cohen outside OLF while delaying any challenge from Polvino.

219. These affirmative acts advanced Cohen's adverse arrangements and concealed their implementation, rather than merely failing to investigate or intervene.

On information and belief, MarVista, Fox Studios, and Fox Corp. provided that assistance to facilitate development through Cohen outside OLF while delaying any challenge from Polvino.

220. Fried's assurances on behalf of MarVista, Fox Studios, and Fox Corp. stated that that an internal resolution was required before MarVista, Fox Studios and Fox Corp. would proceed with further development. Polvino reasonably relied on those assurances by continuing to pursue that resolution and treating both entities as neutral, believing development had stopped. Meanwhile, writing and development continued, including delivery of the Paterson/Mayank draft that Cohen acknowledged receiving on April 29, 2025. By May 9, Polvino had learned development continued and again demanded participation. Defendants' assistance substantially prolonged the concealment while additional work and contractual benefits were developed and claimed outside OLF.

221. As a direct and proximate result, OLF suffered injury from continued development and exploitation of its intellectual property assets outside the agreed structure, including through the creation of the Unauthorized Derivative Works and lost economic benefits and opportunities. Polvino separately suffered continued exclusion from her producing role and deprivation of her personal producer-credit and compensation benefits. Plaintiff seeks damages according to proof for injuries caused by the assistance alleged here, not losses completed before Defendants acquired actual knowledge.

222. MarVista's, Fox Studios' and Fox Corp.'s conduct was fraudulent, malicious, and oppressive because they knowingly and intentionally substantially assisted Cohen's fraud, advanced the Project outside OLF, and concealed that continued development through false assurances, intending to deprive OLF and Polvino of their respective rights, property, and economic benefits. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

## SIXTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (By Polvino Derivatively on Behalf of OLF Against MarVista, Fox Studios, Fox Corp., Robbins, TR Productions, and Cohen)

223. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

### A. Breach of Manager Fiduciary Duty (Against Cohen)

224. Cohen undertook to act as a manager for OLF for discrete assignments authorized by Polvino and Vesely, including executing the Agreement, administering writer engagements, making approved Project payments, and negotiating renewal of the Option Agreement. The fiduciary duties applicable to managers under California Corporations Code § 17704.09. Cohen accepted and performed those assignments on OLF's behalf, thereby assuming duties of loyalty, disclosure, and accounting within their scope. Those duties arose from her role as a manager, not merely her membership, and required her to disclose material information, account for entrusted property, and refrain from using her position to divert OLF's property or opportunities for herself or another entity.

225. Cohen's authority to pursue those transactions for OLF did not authorize her to transfer them outside OLF. Polvino never consented to the transfer of Development Funds, diversion of the Paterson/Mayank negotiations, or redirection of the development and relationships of OLF. As alleged above, those acts required all members' consent, which Cohen did not obtain.

226. Cohen breached her duties by (i) using her account access to spend more than $22,000 on personal or non-Project expenses, close the OLF Account, and transfer approximately $140,000 to KCD or another Cohen Entity; (ii) redirecting the Paterson/Mayank negotiations and OLF's $62,500 payment credit to a Cohen Entity and causing the resulting contractual rights and work product to be claimed outside OLF; (iii) diverting the renewal or replacement Option opportunity she undertook to

pursue for OLF; and (iv) concealing material information concerning those transactions and failing to provide a complete accounting. Moreover, payment of Project expenses with diverted funds did not authorize placing the resulting rights and benefits outside OLF.

227. Those breaches directly and proximately injured OLF by depriving it of possession and control of its funds, diverting its payment credit and writer engagement, impairing its ownership and control of development work, and redirecting its pending Option renewal to others. OLF suffered resulting losses in an amount according to proof. Polvino asserts this claim derivatively on OLF's behalf.

**B. Breach of Joint-Venture Fiduciary Duty**

**(Against MarVista, Fox Studios, and Fox Corp.)**

228. OLF and MarVista formed a joint venture through the Agreement and their performance to develop the Picture for commercial production and exploitation. They combined OLF's Project rights, development work, relationships, and producing services with MarVista's financing and development services, contributing approximately $100,000 and $200,000, respectively, to the Development Fund. Each held an interest in the common undertaking and committed resources subject to its commercial success, with MarVista's reimbursement rights governed by the Agreement, including Paragraph 4.

229. The Agreement provided joint operational control, not merely protections for a financier. Paragraph 2 required mutually agreed development activities, mutual approval of Development Fund services and materials, and collaboration on production planning. Upon proper Studio Option exercise, Paragraph 5(c) provided mutual creative and business approvals, with specified tie-break rights. Even if MarVista remained an investor without exercising the Studio Option, Paragraph 7 preserved joint control over revenues by requiring joint appointment of a collection agent and joint approval of disbursements.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

230. The parties also agreed to participate in the Picture's economic returns. OLF retained ownership of Project-related intellectual property under Paragraph 8 unless and until MarVista exercised the Studio Option. Upon proper exercise, the Agreement assigned the Picture's rights to MarVista, retained OLF as production company under a PSA to be negotiated, and allocated OLF 50% of net profits, subject to certain conditions. These provisions, together with the parties' contributions and operational control, established participation in a common enterprise rather than a financing or contingent-compensation arrangement alone.

231. On information and belief, Fox Corp. and Fox Studios also participated in the venture through authorized representatives, including Fried and Szew, who negotiated its terms and participated in its financing and creative and business oversight. Paragraph 5(e) reserved exclusive worldwide distribution rights, upon exercise of the Studio Option, to FEG, which is managed by Fox Corp. Szew led both FEG and MarVista before his March 2024 appointment to head Fox Entertainment Studios. Those relationships, together with the Fox-affiliated funding and Project-specific conduct alleged above, support the inference that Fried and Szew acted for Fox Corp.; alternatively, for MarVista and Fox Studios or all of them. Fox Corp.'s participation is alleged through its own authorized conduct, not merely its ownership of affiliated entities.

232. As OLF's co-venturers, MarVista and Fox Studios owed OLF duties of loyalty and full disclosure concerning the venture's affairs; Fox Corp. owed those duties if, as alleged alternatively, it joined the venture. Those duties prohibited knowingly using the venture's property, information, or relationships to divert OLF's assets or opportunities for themselves or others without OLF's informed consent. MarVista, Fox Studios, and Fox Corp. through the participation alleged above, breached those duties by (i) helping place the Paterson/Mayank engagement and OLF's $62,500 payment credit with a Cohen Entity; (ii) advancing writing, creative review, packaging, financing, and production planning outside OLF using its



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

development assets and relationships without required OLF participation and approvals; and (iii) knowingly assisting the redirection of OLF's renewal or replacement Option opportunity and related Project benefits to a Cohen Entity, Robbins, or a Robbins Entity.

233. By December 16, 2024, Fried and Szew had received Polvino's written notice of the account closure, transfer of approximately $140,000, diversion of the writer engagement, and her denial of authorization or surrender of rights. Nevertheless, the entities for which they acted continued supporting development outside OLF while Fried represented on January 21 and 28, 2025 that development was on hold and they had not consented to a new entity or structural change. Those assurances and Polvino's exclusion from relevant communications concealed material adverse arrangements affecting OLF's property and participation.

234. Those breaches directly and proximately injured OLF by facilitating diversion of its writer engagement and payment credit, development and exploitation of its intellectual property outside the agreed structure, and redirection of its renewal opportunity and related economic benefits. OLF suffered resulting damages according to proof, including additional injury from continued unauthorized development after the December notice. Polvino asserts this claim derivatively for OLF, not to recover her separate producer-credit or compensation losses.

237. Defendants' breaches were fraudulent and malicious because they knowingly diverted OLF's rights, and business opportunities and concealed those diversions with the intent to deprive OLF of its property, legal rights, and economic benefits. Plaintiff therefore seeks punitive damages derivatively on OLF's behalf under California Civil Code § 3294.

**C. Breach of Joint-Venture Fiduciary Duty**

**(Against Robbins and TR Productions)**

238. Robbins and TR Productions entered into a joint venture with Our Little Fire to develop and produce the Picture for profit. That venture continued with OLF





HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

after Our Little Fire assigned its Option Agreement and related Project rights, to OLF following its formation on May 12, 2022. Through their agreement and reciprocal performance, the parties substituted OLF as the venture's rights-holding participant while continuing their producing and financing arrangement.

239. The venture combined Our Little Fire's—and subsequently OLF's—Project rights, development work, relationships, and producing services with Robbins' and TR Productions' financing and producing services. The parties' negotiations and reciprocal performance reflected an arrangement for shared participation in the venture and its profits, shared development expenses, and joint control over material creative and business decisions. Robbins participated as a full producer and exercised approval rights over writer engagements and material deal terms.

235. Contemporaneous dealings corroborated that arrangement: (i) in May 2020, counsel confirmed an arrangement for sharing development costs, and Cohen described the parties as "50/50 partners"; (ii) Robbins' counsel negotiated writer terms and exercised final approval over material engagements; and (iii) the February 2021 draft operating agreement for MSFM Productions 2020, LLC contemplated shared ownership, development costs, and management, with further contributions subject to mutual agreement and either participant free to cease funding. Although the company was never formed and the agreement never executed, the drafts corroborated the parties' contemplated structure, while their actual dealings demonstrated their producing and financing collaboration.

236. Their performance continued after the assignment to OLF: (i) counsel continued working to finalize the contemplated operating agreement in March and April 2023; (ii) Robbins participated in the November 2023 meeting concerning Paterson and Marshall's engagement; (iii) the February 2024 Agreement identified him as a producer; (iv) TR Productions contributed approximately $100,000 for Project development to SUI on December 15, 2023, of which $65,000 was transferred



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

to OLF on March 14, 2024; and (v) TR Productions contributed another $30,000 directly to OLF on June 5, 2024. Robbins' financial contributions were applied toward OLF's approximate $100,000 Development Fund contribution, and OLF continued developing the Picture with his financing and producing participation. That reciprocal performance carried forward the venture with OLF as its rights-holding participant.

237. In the alternative, if the original venture did not continue with OLF, those post-assignment dealings formed a new joint venture among OLF, Robbins, and TR Productions on the established producing, financing, control, and economic terms.

238. Under either theory, the parties imposed no fixed term, minimum development period, or performance requirement exceeding one year. Their agreed undertakings to pursue continued Option rights, develop the screenplay, and arrange production could have been completed within one year, although performance ultimately continued longer.

239. As OLF's co-venturers under either theory, Robbins and TR Productions owed OLF duties of loyalty and full disclosure concerning the venture's affairs, including a duty not to appropriate its renewal or replacement Option opportunity without informed consent. Robbins knew that Our Little Fire had held the Option, as his counsel expressly acknowledged in May 2020, and that OLF subsequently held the rights to the Option and was pursuing its renewal. His producing and financing role also gave him access to the venture's development materials, budget, Frankl Estate relationship, and renewal information, which he ultimately exploited.

240. On information and belief, Robbins and TR Productions breached those duties by (i) using that position and information to coordinate with Cohen or a Cohen Entity to redirect OLF's pending renewal or replacement opportunity; (ii) acquiring the resulting motion-picture rights directly, through a Robbins Entity, or in privity



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

with a Cohen Entity, without OLF's informed consent; and (iii) continuing development and production of the same Picture outside OLF using the venture's development work and relationships, with Cohen's assistance and MarVista's, Fox Studios' and Fox Corp.'s participation. Robbins' January 2026 public statement that he had acquired the Book's motion-picture rights further supports the acquisition allegation.

241. On information and belief, Robbins and TR Productions began participating in the diversion while the venture remained in existence and before either side withdrew. Then, on October 17, 2024, Cohen works to arrange a meeting between Szew and Robbins, stating that "she just heard back from Tony . . . . He really wants to meet you and was wondering if you can meet in LA in the next few weeks for lunch or dinner." Whether the acquisition closed before or after the Option expired, the challenged diversion began while OLF was pursuing continued rights for the venture.

242. Those breaches directly and proximately injured OLF by diverting its Option renewal opportunity, impairing the value and exploitation of its development assets, and depriving it of continued participation and economic benefits in the Picture. Plaintiff seeks damages according to proof derivatively on OLF's behalf, distinct from Polvino's personal producer-credit and compensation losses.

243. Robbins' and TR Productions' conduct was fraudulent and malicious because they knowingly appropriated and concealed the venture opportunity with the intent to deprive OLF of its property, legal rights, and economic benefits. Plaintiff therefore seeks punitive damages derivatively on OLF's behalf under California Civil Code § 3294.

## SEVENTH CAUSE OF ACTION

**Aiding and Abetting Breach of Fiduciary Duty**

**(By Polvino Derivatively on Behalf of OLF Against MarVista, Fox Corp., Fox Studios, Robbins, and TR Productions)**

244. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

245. Cohen breached the duties she owed Polvino and OLF within the scope of her role as a manager as described above.

246. MarVista, Fox Studios, and Fox Corp. aided and abetted Cohen's breach of her fiduciary duties to OLF and to Polvino by knowingly assisting a competing project structure through Cohen and a Cohen Entity; using OLF's money, writer performance, relationships, and development assets to advance the Project outside OLF; withholding material information about continued development from Polvino; misrepresenting material information about continued development to Polvino; and favoring one OLF fiduciary's adverse interest over the venture's agreed structure.

247. MarVista's, Fox Studios' and Fox Corp.'s aiding and abetting breach of Cohen's fiduciary duties was knowing and intentional. MarVista, Fox Studios, and Fox Corp. received actual notice from Polvino of Cohen's misconduct and fiduciary breaches through Fried and Szew, yet continued to proceed with Cohen alone, provided support to unauthorized development activities that misappropriated the rights and assets of OLF, including the development of Unauthorized Derivative Works and the expenditure of the Development Funds by a party who was not OLF, excluded Polvino from participation in the venture, and treated Cohen as the Project's controlling representative.

248. Upon information and belief, Robbins and TR Productions knew that Cohen was acting as a manager for OLF's in pursuing renewal of the Option Agreement and that she was redirecting that opportunity outside of OLF without




HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

authorization as nearly all of the communications from Robbins regarding the project ran through Cohen. Additionally, on October 17, 2024, Cohen worked to set up a meeting between Robbins and Szew, stating that she "just heard back from Tony . . . . He really wants to meet you and was wondering if you can meet in LA in the next few weeks for lunch or dinner."

249. Robbins and TR Productions aided and abetted Cohen's breach of her duties by acquiring, through a Robbins Entity that Plaintiff is informed and believes acted in privity with Cohen and/or a Cohen Entity, the very option and/or purchase rights that OLF was diverted from renewing, with knowledge of OLF's Option Agreement and negotiations, as evidenced by Robbins' own recorded public admission that he obtained those rights and by his years of direct involvement in the Project's development alongside Polvino and Cohen.

250. As a direct and proximate result, Plaintiff has suffered damages according to proof.

251. Defendants acted with fraud, malice, and oppression by knowingly and intentionally assisting Cohen's breaches of fiduciary duty, including the diversion of OLF's funds, contracts, development assets, and business opportunities, despite actual knowledge that the conduct was unauthorized and adverse to OLF. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

**EIGHTH CAUSE OF ACTION**

**Breach of Duty of Loyalty**

**(By Polvino Derivatively on Behalf of OLF Against Cohen)**

252. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

253. In the alternative, and separate and apart from any duty Cohen has as manager of OLF, Cohen owed OLF a duty of loyalty and care arising from the agency formed on the same grounds that OLF alleges Cohen was a manager.



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

254. In undertaking the assigned transactions on OLF's behalf, Cohen assumed duties of loyalty, disclosure, and accounting concerning those matters, including duties to disclose material information, account for OLF property entrusted to her, and refrain from using her agency to obtain benefits for herself or another entity at OLF's expense. Those duties arose from her agency, not merely from her membership in OLF.

255. Cohen breached those duties by using her signatory bank account access to divert Development Funds to satisfy personal obligations and transfer OLF's remaining funds to KCD or another Cohen Entity; redirecting the Paterson/Mayank negotiations and the economic credit for OLF's $62,500 payment to Paterson to a Cohen Entity; causing the resulting writer rights and work product to be claimed outside OLF; and diverting the renewal or replacement option opportunity she had undertaken to pursue for OLF. She concealed material information concerning those transactions and failed to provide a complete accounting of the OLF funds entrusted to her.

256. These breaches deprived OLF of money, contractual rights, work product, and its renewal opportunity. Polvino asserts this agency-based claim derivatively on OLF's behalf.

257. Defendant acted with fraud, malice, and oppression through intentional diversion of OLF's funds, contracts, development assets, and business opportunities,. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

## <u>NINTH CAUSE OF ACTION</u>

### Aiding and Abetting Breach of Duty of Loyalty

### (By Polvino Derivatively on Behalf of OLF Against MarVista, Fox Studios, Fox Corp., Robbins, and TR Productions)

258. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

259. Cohen breached the duties she owed Polvino and OLF within the scope of her role as an agent to OLF as described above.



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

260. MarVista, Fox Studios, and Fox Corp. aided and abetted Cohen's breach of her duties to OLF and to Polvino by knowingly assisting a competing project structure through Cohen and a Cohen Entity; using OLF's money, writer performance, relationships, and development assets to advance the Project outside OLF; withholding material information about continued development from Polvino; misrepresenting material information about continued development to Polvino; and favoring one OLF fiduciary's adverse interest over the venture's agreed structure.

261. MarVista's, Fox Studios', and Fox Corp.'s aiding and abetting breach of Cohen's duties was knowing and intentional. MarVista, Fox Studios, and Fox Corp. received actual notice from Polvino of Cohen's misconduct and breaches through Fried and Szew, yet continued to proceed with Cohen alone, provided support to unauthorized development activities that misappropriated the rights and assets of OLF, including the development of Unauthorized Derivative Works and the expenditure of the Development Funds by a party who was not OLF, excluded Polvino from participation in the venture, and treated Cohen as the Project's controlling representative.

262. Upon information and belief, Robbins and TR Productions knew that Cohen was acting as OLF's agent in pursuing renewal of the Option Agreement and that she was redirecting that opportunity outside of OLF without authorization as nearly all of the communications from Robbins regarding the project ran through Cohen. Further, on October 17, 2024, Cohen worked to arrange a meeting between Szew and Robbins, stating that "she just heard back from Tony . . . . He really wants to meet you and was wondering if you can meet in LA in the next few weeks for lunch or dinner."

263. Robbins and TR Productions aided and abetted Cohen's breach of her duties by acquiring, through a Robbins Entity that Plaintiff is informed and believes acted in privity with Cohen and/or a Cohen Entity, the very option and/or purchase rights that OLF was diverted from renewing, with knowledge of OLF's Option



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

Agreement and negotiations, as evidenced by Robbins' own recorded public admission that he personally bought those rights and by his years of direct involvement in the Project's development alongside Polvino and Cohen.

264. As a direct and proximate result, Plaintiff has suffered damages according to proof. Polvino asserts this agency-based claim derivatively on OLF's behalf.

265. Defendants acted with fraud, malice, and oppression by knowingly and intentionally assisting Cohen's breaches, including the diversion of OLF's funds, contracts, development assets, and business opportunities, despite actual knowledge that the conduct was unauthorized and adverse to OLF. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

**TENTH CAUSE OF ACTION**

**Intentional Interference with Contract – Development Financing Agreement**
**(By Polvino Derivatively on Behalf of OLF**
**Against Robbins, TR Productions, and Cohen)**

266. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

267. OLF and MarVista entered into the valid and enforceable Agreement dated February 28, 2024 and countersigned March 8, 2024. Cohen was not individually a party to the Agreement; she signed solely on OLF's behalf.

268. Cohen, Robbins, and TR Productions knew of the Agreement and OLF's rights under it. On information and belief, Robbins and TR Productions knew its material terms through their producing and financing participation, including funding OLF's Development Fund contribution.

269. Defendants intended to disrupt performance of the Agreement or knew that disruption was substantially certain to result from their conduct alleged below.

**A. Cohen**

270. Cohen exceeded the scope of her authority to act for OLF—whether as a manager under an implied operating agreement or, alternatively, as an agent—when



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

she, acting for her own benefit, diverted OLF's funds, writer engagement, payment credit, and development assets to a Cohen Entity and redirected OLF's Option-renewal opportunity outside OLF.

271. Her authority to pursue transactions for OLF did not authorize her to divert their benefits to another entity at OLF's expense. Those acts furthered her personal interests and other interests adverse to OLF, facilitating MarVista's continued development without OLF's ownership, participation, or required approvals. On information and belief, Cohen further facilitated OLF's displacement through its unauthorized cancellation and through the formation and use of OLF #2 for purported Project assignments and quitclaims.

272. B. Robbins and TR Productions

273. On information and belief, Robbins and TR Productions coordinated with Cohen or a Cohen Entity to divert OLF's pending renewal or replacement Option opportunity and acquire the resulting rights outside OLF. Robbins participated directly and through TR Productions, which, on information and belief, financed and participated in the acquisition.

274. By redirecting those rights and advancing the Picture with MarVista outside OLF, Robbins and TR Productions impaired OLF's ability to secure the rights required for its performance and facilitated MarVista's development and production without OLF's contractual participation.

275. Defendants' conduct disrupted the Agreement by placing development funds, engagements, assets, and underlying rights outside OLF and facilitating MarVista's continued performance through others rather than OLF. MarVista then invoked OLF's loss of the underlying rights in the Fox Breach Notice to justify proceeding with those controlling them.

276. Defendants' interference was a substantial factor in causing OLF to lose control and value of its development assets and the ownership, participation, and

economic benefits secured by the Agreement, subject to its stated conditions. Plaintiff seeks damages according to proof derivatively on OLF's behalf.

277. Defendants acted fraudulently and maliciously by knowingly diverting and concealing OLF's funds, rights, and contractual benefits with the intent to appropriate them for themselves or other entities. Plaintiff therefore seeks punitive damages derivatively on OLF's behalf under California Civil Code § 3294.

## ELEVENTH CAUSE OF ACTION

**Intentional Interference with Prospective Economic Advantage – Paterson/Mayank Agreement**

**(By Polvino Derivatively on Behalf of OLF and Polvino Individually Against Cohen, MarVista, Fox Studios, and Fox Corp.)**

278. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

279. OLF had established economic relationships with Paterson and Mayank that carried probable future economic benefits, including continued producing services and fees, contingent compensation, and financing and production opportunities arising from the Project.

280. Polvino had established economic relationships with Paterson and Mayank that carried probable future economic benefits, including producing services and fees, contingent compensation, and financing and production opportunities arising from the Project.

281. Cohen, MarVista, Fox Studios, and Fox Corp. knew of these relationships because she participated in them and engaged in independently wrongful conduct, including fraud, conversion, civil theft, and breach of fiduciary duty designed to disrupt these relationships, including diverting Development Funds.

282. MarVista, Fox Studios and Fox Corp. knew of these relationships because it drafted and negotiated the Agreement, conducted chain-of-title diligence,

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

provided development services, and participated in the approval and development process.

**A. Cohen**

283. Cohen intentionally interfered with the Paterson/Mayank Agreement by redirecting Paterson's and Mayank's engagement and OLF's $62,500 payment credit to a Cohen Entity, purporting to replace OLF as contracting party, and causing later writing performance to be claimed outside OLF's ownership without an authorized assignment, modification, or novation of the Paterson/Marshall Agreement.

**B. MarVista, Fox Studios, and Fox Corp.**

284. MarVista, Fox Studios, and Fox Corp. intentionally interfered with the Paterson/Mayank Agreement by, upon information and belief, assisting in the replacement of OLF with a Cohen Entity in connection with the Paterson/Mayank Agreement, using the Paterson First Act Material owned by OLF through the Paterson/Marshall Agreement to approve and guide Paterson's and Mayank's work and whose results and proceeds benefited a Cohen Entity, and continuing development under a Cohen Entity structure with knowledge of OLF's existing contract and ownership rights.

285. The aforementioned acts disrupted and interfered with OLF's prospective economic relationship with Paterson and Mayank causing damages to be proven at trial.

286. Defendants acted with malice, fraud, and oppression by intentionally disrupting Plaintiff's economic relationships through independently wrongful conduct, including fraud, fiduciary breaches, conversion, and the unauthorized diversion of OLF's money, rights, and opportunities. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

## TWELFTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage – Option Renewal Opportunity

### (By Polvino Derivatively on Behalf of OLF and Polvino Individually Against Robbins, TR Productions, and Cohen)

287. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

288. OLF had established economic relationships with the Frankl Estate that carried probable future economic benefits, including continued option rights and financing and production opportunities arising from the Project.

289. Polvino had established economic relationships with the Frankl Estate that carried probable future economic benefits, including producing services and fees, contingent compensation, and financing and production opportunities arising from the Project. Had OLF renewed the Option, the Picture would have proceeded under the financing and production structure from which Polvino expected to earn producing fees.

#### A. Cohen

290. Cohen knew of these relationships because she participated in them and engaged in independently wrongful conduct, including fraud, conversion, civil theft, and breach of fiduciary duty designed to disrupt these relationships, including diverting Development Funds.

#### B. Robbins and TR Productions

291. Upon information and belief, Robbins was aware that OLF and Polvino were working to secure an extension on the option given his years of involvement with the Project, his substantial financial contribution to the Project, and his position as a producer for the Project. Upon information and belief, Robbins was aware because he also regularly communicated with Cohen, who was tasked with

overseeing the extension of the option, due to a personal friendship between the two formed early on in the process of the Project's development.

292. Robbins, TR Productions, and Cohen intentionally interfered with OLF's renewal of the Option Agreement with the Frankl Estate by acquiring, through a Robbins Entity that Plaintiff is informed and believes acted in privity with Cohen and/or a Cohen Entity, the very Option and/or purchase rights that OLF was diverted from renewing, with knowledge of OLF's Option Agreement and negotiations, as evidenced by his own recorded public admission that he personally bought those rights and by his years of direct involvement in the Project's development alongside Polvino and Cohen.

293. Whether the acquisition occurred before or after the Option Agreement expired, the challenged conduct diverted OLF's pending opportunity to renew or replace the Option Agreement with the Frankl Estate.

294. The aforementioned acts disrupted OLF's option-renewal relationship with the Frankl Estate, Polvino's producer and financing relationships and the development enterprise created by the Agreement by redirecting third parties to a project structure that excluded OLF and Polvino.

295. As a direct and proximate result, Plaintiff's prospective economic relationships were disrupted and interfered with, causing damages to be proven at trial.

296. Defendants acted with malice, fraud, and oppression by intentionally disrupting Plaintiff's economic relationships through independently wrongful conduct, including fraud, fiduciary breaches, conversion, and the unauthorized diversion of OLF's money, rights, and opportunities. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

## THIRTEENTH CAUSE OF ACTION

**Direct Copyright Infringement, 17 U.S.C. § 501**
**(By Polvino Derivatively on Behalf of OLF**
**Against Cohen and DOES 1 through 10)**

297. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

298. In October 2025, Polvino personally submitted a copyright application on OLF's behalf covering four unpublished MSFM development works: (i) the 2023 screenplay draft written by Paterson and Marshall (the "Paterson/Marshall Draft"); (ii) the 39-page 2024 screenplay draft written by Paterson and dated August 29, 2024 [i.e., the Paterson First Act Materials]; and (iii) two 2023 revised outlines (the "Revised Outlines") (collectively, "Copyrighted Works"). The 2024 Paterson First Act Materials were selected as the deposit for the claim that became U.S. Copyright Office Registration No. PAu 4-288-510, effective October 11, 2025. The 2023 Paterson/Marshall Draft was separately registered as Registration No. PAu 4-289-545, effective January 30, 2026, and the Revised Outlines were separately registered together as Registration No. PAu 4-288-819, effective January 30, 2026. As such, the Copyrighted Works constitute original works of authorship protected under the copyright laws of the United States.

299. OLF is the sole and exclusive owner of all copyright rights in and to the Copyrighted Works.

300. OLF has not provided authorization to Cohen, MarVista, Fox Studios, and Fox Corp. to copy or publicly perform the Copyrighted Works, or to exercise any other rights affecting the copyrights with respect to the Copyrighted Works.

301. Cohen had direct access to the Copyrighted Works through her roles at OLF and through years of commissioning, reviewing, and developing materials related to the Project.

302. Cohen has infringed and is infringing OLF's copyrights in the Copyrighted Works by reproducing and distributing copies of the Copyrighted Works for the benefit of another party other than OLF.

303. Cohen has never been licensed or authorized by OLF to reproduce or distribute the Copyrighted Works.

304. In a September 12, 2024 email, Pillemer specifically asked whether Mayank had "pitched an outline" or whether there was "a road map for the work they are planning to do." The Paterson First Act Materials were re-supplied to Fox Studios and Fox Corp. in direct response to that question. Cohen explained that the Paterson First Act Materials came out of conversations between Paterson and Mayank. The Paterson First Act Materials were used to evaluate and approve the direction Paterson and Mayank were taking the screenplay and to approve Mayank as Paterson's new co-writer.

305. Cohen thereafter caused the writing deal negotiated in the name of OLF to be contracted through a Cohen Entity while development based on the Paterson First Act Materials continued, and Cohen admitted that the "new writing team" (i.e. Paterson and Mayank) had delivered a draft of the screenplay to her for the benefit of a Cohen Entity.

306. On information and belief, Cohen prepared or caused to be prepared additional screenplay drafts and other derivative works using protected expression from the Copyrighted Works, including the Paterson/Mayank screenplay and the Cohen Draft, among other materials, and distributed those materials to MarVista, Fox Corp., Fox Studios, and third parties in connection with the development, packaging, financing, or production of the Picture. Cohen directed or facilitated the preparation of those works for the benefit of herself or a Cohen Entity rather than OLF as part of her efforts to defraud OLF, the copyright owner, of its rights, without authorization from the copyright owner.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

307. Polvino has requested but has been unable to obtain copies of the subsequent screenplay drafts and other Unauthorized Derivative Works to compare them against the Copyrighted Works. Those materials are, on information and belief, within Cohen's, Fox Studios', MarVista's and Fox Corp.'s possession and control. Plaintiff alleges copying and substantial similarity on information and belief based on Cohen's access to the Copyrighted Works, the documented use of the Paterson First Act Materials as a roadmap for the subsequent writing engagement, the continuation of development through the same writers, and the preparation and delivery of later screenplay drafts outside OLF.

308. On information and belief, Cohen's acts of copyright infringement have continued after the registration of the Copyrighted Works was completed and such acts have been willful, intentional, and purposeful in disregard of and indifference to OLF's rights.

309. As a direct and proximate result, OLF is entitled to actual damages and infringer profits under 17 U.S.C. § 504(b), including loss of control over the Copyrighted Works, diminished value of the Copyrighted Works, and lost licensing and exploitation opportunities, in an amount to be proven at trial. Plaintiff is also entitled to injunctive relief and to the impoundment and disposition of infringing articles to the extent permitted by 17 U.S.C. §§ 502–503.

310. OLF has suffered, and will continue to suffer, irreparable harm from Cohen's acts of copyright infringement unless restrained by law. OLF has no adequate remedy at law. Therefore, OLF is entitled to injunctive relief as provided by 17 U.S.C. § 502.

## FOURTEENTH CAUSE OF ACTION

**Contributory Copyright Infringement, 17 U.S.C. § 501**
**(By Polvino Derivatively on Behalf of OLF**
**Against MarVista, Fox Studios, and Fox Corp.)**

311. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

### A. Cohen's Direct Infringement

312. Cohen and Does 1 through 10 directly infringed the Copyrighted Works as alleged above.

313. In a September 12, 2024 email, Pillemer specifically asked whether Mayank had "pitched an outline" or whether there was "a road map for the work they are planning to do." The Paterson First Act Materials were re-supplied to MarVista in direct response to that question. Cohen explained that the Paterson First Act Materials came out of conversations between Paterson and Mayank. The Paterson First Act Materials were used to evaluate and approve the direction Paterson and Mayank were taking the screenplay and to approve Mayank as Paterson's new co-writer.

### B. Knowing Material Contribution by MarVista and Fox Corp.

314. MarVista and Fox Corp. knowingly induced, caused, and/or materially contributed to Cohen's direct infringement. Szew received Polvino's December 16, 2024 written notice simultaneously as MarVista's Chief Executive Officer and as head of Fox Corp.'s Fox Entertainment studios business, and Fried received that notice as agent of both entities. After that notice, MarVista and Fox Corp. continued to provide creative, legal, and financial support to the Cohen Entity's preparation and exploitation of derivative writing based on OLF-owned materials, including by continuing to give creative notes and development support on the Unauthorized Derivative Works. Pillemer's September 12, 2024 road-map email is alleged as evidence of access and causation for Cohen's direct infringement only; it predates the December 16, 2024 notice and does not supply the knowledge element for contributory liability.

315. MarVista, Fox Studios, and Fox Corp. are each liable on this Count. On information and belief, the conduct of Fried and Szew alleged in this Count—including Szew's and Fried's receipt of Polvino's December 16, 2024 notice and the

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

continued support for the Cohen Entity's infringement—was undertaken on behalf of Fox Corp and Fox Studios.; in the alternative, on behalf of MarVista, or on behalf of all of them.

316. As a direct and proximate result of the affirmative inducement and intentional conduct alleged above, infringement occurred and OLF suffered damages according to proof.

317. Because all three of OLF's copyright registrations (PAu 4-288-510, PAu 4-289-545, and PAu 4-288-819) became effective after the alleged infringement commenced, OLF's recovery on this Count is limited to actual damages and infringer profits under 17 U.S.C. § 504(b) and injunctive relief under 17 U.S.C. § 502.

## FIFTEENTH CAUSE OF ACTION

**Vicarious Copyright Infringement, 17 U.S.C. § 501**
**(By Polvino Derivatively on Behalf of OLF**
**Against MarVista, Fox Studios, and Fox Corp.)**

318. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

319. Cohen and Cohen Entity Does directly infringed the Copyrighted Works as alleged above.

320. In a September 12, 2024 email, Pillemer specifically asked whether Mayank had "pitched an outline" or whether there was "a road map for the work they are planning to do." The Paterson First Act Materials were re-supplied to Fox Studios and Fox Corp. in direct response to that question. Cohen explained that the Paterson First Act Materials came out of conversations between Paterson and Mayank. The Paterson First Act Materials were used to evaluate and approve the direction Paterson and Mayank were taking the screenplay and to approve Mayank as Paterson's new co-writer.

321. MarVista, Fox Studios, and Fox Corp. exercised contractual and practical control over writer approval, script review, development decisions,

financing, and packaging. MarVista, Fox Studios, and Fox Corp.'s personnel could withhold approval, notes, financing, and continued development participation and, on information and belief, exercised control over those contracts throughout preparation of Unauthorized Derivative Works.

322. MarVista, Fox Studios, and Fox Corp. also had a direct financial interest in continued development of the Project, including their development investment and potential Studio Option and net-profit position. The unauthorized writing advanced the specific Project from which those benefits were expected, rather than merely increasing traffic in general service to the Project.

323. MarVista, Fox Studios, and Fox Corp. derived a direct financial benefit from the infringing activity, which advanced their development objectives, preserved and enhanced the Project's commercial value, and allowed development to continue without the delay, expense, or risk that compliance with OLF's rights would have entailed.

324. As a direct and proximate result, OLF suffered damages in an amount to be proven at trial.

**<u>SIXTEENTH CAUSE OF ACTION</u>**

**Civil Theft, Cal. Penal Code § 496(c)**

**(By Polvino Derivatively on Behalf of OLF Against Cohen, RAX, KCD, and DOES 1 through 10)**

325. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

326. OLF owned and had the right to possess the Development Funds maintained in its dedicated OLF Account, including the approximately $140,000 remaining balance when Cohen closed that account and diverted the funds, as well as the additional specific OLF funds of approximately $22,000 Plaintiff alleges Cohen diverted for personal or non-Project purposes.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

### A. Cohen

327. Cohen intentionally and wrongfully obtained, concealed, and withheld OLF's money in a manner constituting theft without a good-faith claim of right by closing OLF's account, transferring approximately $140,000 of OLF's account balance to her personal checking account, KCD's checking account ending in 1005, and/or a Cohen Entity she controlled, refusing to disclose or restore the money when Polvino demanded an explanation and return, using OLF funds to support contractual obligations undertaken in a Cohen Entity's name, using OLF funds to form RAX, and previously causing approximately $22,000 of OLF funds to be paid or transferred for expenses Plaintiff alleges were personal or unrelated to approved Project development.

### B. Knowing Receipt by KCD and RAX

328. Cohen, KCD, RAX, or one or more of the Doe Defendants knowingly received and retained the approximately $140,000 and other OLF-funded benefits at Cohen's direction. Because Cohen had control over the OLF Account and caused the transfer, and owned and/or controlled the recipient entity, Plaintiff alleges the recipient knew the money originated in the OLF Account, knew that it was not the recipient's property, and knew it had been transferred without OLF's approval and outside the structure required by the Agreement in a manner constituting theft. On information and belief, RAX also knowingly received and retained the benefit of OLF funds: its $229 formation fee, paid to Harvard Business Services, was paid with OLF Development Funds, and RAX exists only because of that payment.

329. As a direct and proximate result, OLF suffered actual damages according to proof.

330. Defendants acted with fraud, malice, and oppression by knowingly obtaining, receiving, concealing, or withholding OLF's property without authorization or a good-faith claim of right and using that property to advance



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

interests adverse to OLF. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

**SEVENTEENTH CAUSE OF ACTION**
**Conversion**
**(By Polvino Derivatively on Behalf of OLF Against Cohen, RAX, KCD, and DOES 1 through 10)**

331. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

332. OLF owned and had the immediate right to possess the development assets, and the Development Funds in its dedicated account, including the approximately $140,000 balance transferred when Cohen closed the account and the additional specific OLF funds of approximately $22,000 that Plaintiff alleges Cohen used for personal purposes.

333. Cohen exercised dominion inconsistent with OLF's rights by closing the OLF Account in breach of the Agreement, transferring the balance to KCD's checking account, a Cohen Entity or Cohen's personal bank account, and using OLF money for purposes not authorized by OLF or the Agreement, including the formation of RAX.

334. As a direct and proximate result, OLF suffered damages according to proof.

335. Defendants acted with fraud, malice, and oppression by knowingly exercising unauthorized dominion over OLF's funds and property, refusing to return or account for that property after demand, and using it to advance the Project outside OLF. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

**EIGHTEENTH CAUSE OF ACTION**

**Civil Conspiracy**

**(By Polvino Derivatively on Behalf of OLF and Polvino Individually Against Robbins, TR Productions, Fox Corp., Fox Studios, MarVista, and DOES 1 through 10)**

336. Plaintiff incorporates the allegations in Paragraphs 1 through 346 as though fully set forth herein.

337. Robbins, TR Productions, Fox Corp., Fox Studios, MarVista, and Does 1 through 10 are liable as coconspirators for the following acts committed in furtherance of the conspiracy (collectively, the "Underlying Wrongs"): (a) Cohen's breach of fiduciary duties to OLF, including diversion of its Option Agreement renewal opportunity; (b) intentional interference with OLF's prospective economic relationship with the Frankl Estate; (c) Cohen's fraud; and (d) intentional interference with the Option Agreement and, as to defendants other than MarVista, intentional interference with the Agreement. As a direct party to the Agreement, MarVista's conspiracy liability does not arise from Underlying Wrong (d) as it relates to the Agreement; it arises from Underlying Wrongs (a), (b), and (c), and from its facilitation of the other defendants' interference with the Option Agreement.

338. The Conspiracy began taking shape no later than September 2024, when Savage and Cohen began diverting OLF's writer engagement to a Cohen Entity. Cohen and Vesely formalized their internal agreement to exclude Polvino on October 10, 2024, when Cohen deliberately excluded Polvino from their call with Vesely. A conspiracy existed among Cohen, Vesely, Robbins, TR Productions, Fox Corp., Fox Studios, MarVista, and Does 1 through 10 to divert the Project, the Option Agreement renewal, and the motion-picture rights in the Book from OLF and Polvino, and to develop and produce the Picture without them (the "Conspiracy"). On December 16,

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

2024, after Polvino objected to Cohen's transfer of OLF's Development Funds and writer agreement to a Cohen Entity, Vesely confirmed: "[Cohen] did not act alone. I was and am aware."

339. Plaintiff further alleges on information and belief that Robbins, individually and through TR Productions, expressly or tacitly agreed with Cohen to divert OLF's renewal or replacement option/purchase opportunity, acquire the motion-picture rights through Robbins, a Robbins Entity, or in privity with a Cohen Entity, and proceed with the Picture outside OLF and without Polvino.

340. Plaintiff further alleges on information and belief that Fox Corp., acting through Szew and/or Fried in their respective capacities as agents and/or representatives of Fox Corp. and/or Fox Studios, expressly or tacitly agreed with Cohen, Vesely, and Robbins to facilitate the diversion of OLF's option-renewal opportunity, to support and advance the Project's development outside OLF and without Polvino, and to proceed with development and eventual production of the Picture through a structure that excluded OLF and Polvino. Fox Corp.'s participation in the Conspiracy arose from its exercise of actual control over the Project through its subsidiary MarVista and through Szew and Fried, each of whom Plaintiff alleges acted on behalf of Fox Corp. and/or Fox Studios in the alternative.

341. Plaintiff further alleges on information and belief that Fox Studios, acting through Szew and/or Fried in their respective capacities as agents and/or representatives of Fox Studios and/or Fox Corp., expressly or tacitly agreed with Cohen, Vesely, Robbins, and Fox Corp. to facilitate the diversion of OLF's option-renewal opportunity and to support the Project's development through a structure that excluded OLF and Polvino. Fox Studios' agreement is reflected in Szew's arrangement on October 17, 2024 of a meeting with Robbins eight days before Option expiration, his travel to Vienna on expiration day to meet with members of the Frankl Estate and Vesely, and Fried's false written representations to Polvino in January 2025—acts undertaken in Szew's and Fried's respective capacities as agents and/or

representatives of Fox Studios and/or Fox Corp. in the alternative, and directly advancing the diversion of OLF's renewal opportunity to a structure that excluded OLF.

342. Plaintiff further alleges on information and belief that MarVista, acting through Savage and Fried, expressly or tacitly agreed with Cohen, Vesely, Robbins, Fox Corp., and Fox Studios to facilitate the diversion of OLF's writer relationship and development assets to a Cohen Entity, and to continue developing and financing the Picture through a structure that excluded OLF and Polvino. MarVista's agreement is reflected in Savage's decision to draft the Paterson/Mayank Agreement for a Cohen Entity despite knowing that OLF or an OLF-owned WGA signatory was required as the contracting party, and in its continued support of the Project after receiving actual written notice of Cohen's unauthorized diversion.

343. The Conspiracy involves at least seven distinct actors—Cohen, Vesely, Robbins, TR Productions, Fox Corp., Fox Studios, and MarVista—each of whom independently agreed to and furthered its objectives. Because the Conspiracy extends well beyond any single corporate relationship and includes parties entirely outside any Fox-affiliated enterprise, no intracorporate immunity or single-enterprise doctrine bars the claims alleged herein. Each defendant's agreement and conduct is separately alleged.

344. The Conspiracy may be inferred as to Robbins and TR Productions from: (i) Robbins' years-long joint venture with OLF and its predecessor, producer role, and friendship and regular communications with Cohen; (ii) the diversion of OLF's renewal opportunity to a Cohen Entity or Robbins Entity after Polvino's exclusion; (iii) Robbins' acquisition, on information and belief in coordination with Cohen, of the rights OLF held and sought to renew; and (iv) his continued participation as a producer alongside Cohen and Vesely outside OLF and public statements that he bought the rights and believes the Picture can perform as well as "Sound of Freedom."

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

345. The Conspiracy may be inferred as to Fox Corp. from: (i) Cohen's arrangement, on or about October 17, 2024, of a meeting between Szew—acting in his capacity as agent and/or representative of Fox Corp. and/or Fox Studios—and Robbins, eight days before the Option expired, connecting Fox Corp.'s senior leadership to the principal acquirer of OLF's diverted rights at the critical moment; (ii) Szew's travel to Vienna on October 25, 2024—the precise date of the Option's expiration—to meet with members of the Frankl Estate and Vesely, placing Fox Corp.'s representative at the critical site on expiration day; (iii) Fox Corp.'s continued development and financing of the Picture with Cohen, Vesely, and Robbins after receiving actual written notice from Polvino on December 16, 2024, of Cohen's unauthorized diversion of OLF's funds, writer agreements, and rights; (iv) Fried's false written assurances to Polvino in January 2025, made in his capacity as agent and/or representative of Fox Corp. and/or Fox Studios, that development was "on hold" while development in fact continued; (v) Fox Corp.'s and/or Fox Studios's transmission of the Fox Breach Notice in July 2025 invoking OLF's loss of the very Option rights Fox Corp. and/or Fox Studios had helped engineer and divert, thereby using a self-created condition to justify proceeding with Robbins rather than OLF; and (vi) the full nature and content of the coordination between Fox Corp.'s and Fox Studios's representatives and the other members of the Conspiracy, which is within Fox Corp.'s and Fox Studios's knowledge and control and subject to discovery.

346. The Conspiracy may be inferred as to Fox Studios from: (i) Szew's role as agent and/or representative of Fox Studios and/or Fox Corp. and his personal arrangement on October 17, 2024 of the Cohen-brokered meeting with Robbins eight days before Option expiration, connecting Fox Studios' leadership directly to the principal acquirer of OLF's diverted rights; (ii) Szew's travel to Vienna on expiration day—October 25, 2024—to meet with members of the Frankl Estate and Vesely, placing Fox Studios' representative at the critical site at the critical moment; (iii) Fried's false written assurances to Polvino in January 2025, made in his capacity as



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

agent and/or representative of Fox Studios and/or Fox Corp., that development was "on hold" while development in fact continued; (iv) Fox Studios's and/or Fox Corp.'s transmission of the Fox Breach Notice in July 2025 invoking OLF's loss of the very Option rights Fox Studios and/or Fox Corp. had helped engineer and divert, thereby using a self-created condition to justify proceeding with Robbins rather than OLF; and (v) the full nature and content of Szew's and Fried's coordination with the other members of the Conspiracy in their respective capacities as representatives of Fox Studios and/or Fox Corp., which is within Fox Studios's and Fox Corp.'s knowledge and control and subject to discovery.

347. The Conspiracy may be inferred as to MarVista from: (i) Savage's September 25, 2024 inquiry whether OLF or a different entity would be the contracting party for the Paterson/Mayank Agreement, followed by her drafting that agreement in a Cohen Entity's name despite knowing, from her role drafting the Agreement, that OLF or an OLF-owned WGA signatory was required; (ii) MarVista's receipt and use of OLF's Paterson First Act Materials to evaluate and approve Mayank's engagement while those materials were simultaneously supplied to Fox Corp. and Fox Studios and used to advance development outside OLF; (iii) Fried's receipt of Cohen's false representation that Polvino had agreed to relinquish her producer role, and his transmission of false assurances to Polvino in January 2025 that development was "on hold" while MarVista, Fox Corp., and Fox Studios continued to support and direct development; (iv) MarVista's continued support of the Project with Cohen, Vesely, and Robbins after receiving Polvino's December 16, 2024 written notice of the unauthorized diversion; and (v) the full nature and content of MarVista's coordination with the other members of the Conspiracy, which is within MarVista's knowledge and control and subject to discovery. Does 1 through 10 include additional entities and individuals whose full roles in the coordination described herein will be identified and confirmed through discovery.



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

348. Robbins and TR Productions knew of the plan to divert OLF's renewal opportunity and the motion-picture rights in the Book. In May 2020, Robbins' counsel, Breimer, acknowledged that Our Little Fire alone held the Option, and Cohen confirmed that no action concerning the rights would be taken without Robbins' approval. Plaintiff alleges on information and belief that Robbins knew OLF was pursuing renewal, the Agreement required OLF to secure the necessary development rights, and his acquisition furthered the diversion without Polvino's consent. Robbins acted individually and through TR Productions and, on information and belief, may also have acted through a Robbins Entity.

349. Fox Corp. knew of OLF's plan to renew the Option Agreement and of OLF's exclusive right to do so. Acting through MarVista and through Szew and Fried in their respective capacities as agents and/or representatives of Fox Corp. and/or Fox Studios, Fox Corp. had reviewed and approved OLF's chain of title—including the Option Agreement and its October 25, 2024 expiration—and had approved a development budget that expressly earmarked funds for the Option renewal. Fox Corp. therefore knew, at the time of Szew's Vienna trip and the Cohen-arranged Szew-Robbins meeting, that OLF was the entity entitled to renew the Option, that OLF was actively pursuing renewal, that OLF's Development Funds had been earmarked for that purpose, and that any diversion of that opportunity away from OLF would harm OLF and Polvino.

350. Fox Studios likewise knew of OLF's plan to renew the Option Agreement and of OLF's exclusive right to do so. Acting through Szew and Fried in their respective capacities as agents and/or representatives of Fox Studios and/or Fox Corp., Fox Studios had reviewed OLF's chain of title—including the Option Agreement and its October 25, 2024 expiration—and participated in approving the development plan that expressly earmarked funds for the Option renewal. Fox Studios therefore knew, at the time Szew coordinated scheduling on October 17, 2024 and his Vienna trip on expiration day, that OLF was actively pursuing renewal as the



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

entity entitled to do so, and that the coordination Szew and Fried were facilitating would divert that opportunity away from OLF.

351. MarVista likewise knew of OLF's right to renew the Option and of the diversion's impact on OLF. MarVista had reviewed OLF's chain of title and approved a development budget that included an option renewal fee. Savage's September 25, 2024 inquiry confirmed her awareness that OLF—not a Cohen Entity—was the required contracting party for guild-covered writer engagements under the Agreement she had helped draft. MarVista received Polvino's December 16, 2024 written notice of the unauthorized diversion and her demand that OLF be restored to its rightful position, yet continued to support development outside OLF.

352. Robbins and TR Productions agreed with Cohen that the Underlying Wrongs be committed and furthered the Conspiracy by acquiring, through a Robbins Entity acting in privity with Cohen and/or a Cohen Entity, the Option and/or purchase rights OLF was prevented from renewing, and continuing to develop and produce the Picture with Cohen and Vesely outside OLF and without Polvino and, on information and belief, to finance it.

353. Fox Corp. agreed, expressly or tacitly, to further the Conspiracy by: (i) facilitating, through Szew's presence in Vienna on expiration day and coordination on October 17, 2024 of a meeting Cohen arranged between Szew and Robbins, the coordination required to redirect OLF's option-renewal opportunity to a structure that excluded OLF—Szew acting in his capacity as agent and/or representative of Fox Corp. and/or Fox Studios in the alternative; (ii) continuing to develop and support the Picture with Cohen, Vesely, and Robbins after receiving Polvino's December 16, 2024 written notice of Cohen's unauthorized diversion of OLF's rights, funds, and contractual position; (iii) making false written representations to Polvino through Fried in January 2025 that development was "on hold" and that there had been no discussions about other matters on the project, while in fact continuing such discussions and development—Fried acting in his capacity as agent and/or

representative of Fox Corp. and/or Fox Studios in the alternative; (iv) transmitting the Fox Breach Notice in July 2025 invoking OLF's loss of the Option as grounds to deal with Robbins rather than OLF, thereby exploiting a circumstance Fox Corp. and/or Fox Studios had helped create; and (v) on information and belief, supporting and advancing production of the Picture through a structure that permanently excluded OLF and Polvino.

354. Fox Studios agreed, expressly or tacitly, to further the Conspiracy by: (i) through Szew, coordinating on October 17, 2024 a meeting Cohen arranged between Szew and Robbins—eight days before Option expiration—thereby connecting Fox Studios' leadership to the principal acquirer of OLF's diverted rights at the moment the diversion was being finalized—Szew acting in his capacity as agent and/or representative of Fox Studios and/or Fox Corp. in the alternative; (ii) through Szew, traveling to Vienna on October 25, 2024—the precise date of the Option's expiration—to meet with members of the Frankl Estate and Vesely, directly facilitating the expiration of OLF's renewal rights without OLF's involvement; (iii) making false written representations to Polvino through Fried in January 2025 that development was "on hold" while Fox Studios, Fox Corp., and MarVista continued to support and direct development outside OLF—Fried acting in his capacity as agent and/or representative of Fox Studios and/or Fox Corp. in the alternative; (iv) transmitting the Fox Breach Notice in July 2025 invoking OLF's loss of the Option as grounds to deal with Robbins rather than OLF, thereby exploiting a circumstance Fox Studios and/or Fox Corp. had helped create; and (v) on information and belief, supporting and advancing production of the Picture through a structure that permanently excluded OLF and Polvino.

355. MarVista agreed, expressly or tacitly, to further the Conspiracy by: (i) through Savage, drafting the Paterson/Mayank Agreement in a Cohen Entity's name despite knowing that OLF or an OLF-owned WGA signatory was the required contracting party, thereby redirecting OLF's funded writer relationship and the

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

resulting intellectual property to a Cohen Entity; (ii) receiving and using OLF's Paterson First Act Materials to evaluate and approve Mayank's engagement under a structure that excluded OLF; (iii) through Fried, making false written representations to Polvino in January 2025 that development was "on hold" while MarVista, Fox Corp., and Fox Studios continued to support and direct development outside OLF; (iv) continuing to develop and support the Picture with Cohen, Vesely, and Robbins after receiving Polvino's December 16, 2024 written notice of Cohen's unauthorized diversion; and (v) supporting the Project's continued development under the structure the Fox Breach Notice was designed to advance, which exploited a condition MarVista and Fox Corp. and/or Fox Studios had helped bring about.

356. The Conspiracy members committed one or more of the following overt acts to further the Conspiracy: (i) Cohen's exclusion of Polvino from the October 10, 2024 call with Vesely; (ii) Cohen's exclusion of Polvino from renewal negotiations after November 4, 2024, and diversion of OLF's renewal opportunity; (iii) Cohen's placement of the Paterson/Mayank Agreement with a Cohen Entity rather than OLF; (iv) Cohen's December 12, 2024 closure of the OLF Account and transfer of approximately $140,000 in Development Funds to KCD; (v) Cohen's false statements to MarVista, Fox Corp., and Fox Studios that Polvino had relinquished her role and rights in the Project; (vi) Robbins' acquisition of the rights, directly or through a Robbins Entity, alone or in privity with a Cohen Entity; (vii) Robbins' continued participation as a producer and, on information and belief, financier of the Picture; (viii) Szew's travel to Vienna on October 25, 2024—the expiration date of the Option Agreement—to meet with members of the Frankl Estate and Vesely on behalf of Fox Corp. and/or Fox Studios; (ix) Cohen's October 17, 2024 arrangement of a meeting between Szew and Robbins—eight days before Option expiration—on behalf of and with the knowledge of Fox Corp. and/or Fox Studios; (x) Savage's drafting of the Paterson/Mayank Agreement for a Cohen Entity rather than OLF despite knowing OLF was the required contracting party; (xi) Fried's false written assurances to

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

Polvino in January 2025, made in his capacity as agent and/or representative of Fox Corp. and/or Fox Studios and of MarVista, that development was "on hold" while Fox Corp., Fox Studios, and MarVista continued to support and direct development outside OLF; and (xii) Fox Corp.'s and/or Fox Studios's and MarVista's transmission of the Fox Breach Notice in July 2025 invoking OLF's loss of the Option—a condition they had helped engineer—to justify proceeding with Robbins rather than OLF.

357. Plaintiff alleges on information and belief that Robbins and TR Productions, directly or through a Robbins Entity, acting alone or in concert with a Cohen Entity, worked with Cohen before the Option's expiration to facilitate its acquisition, thereby participating in the Conspiracy before expiration regardless of when acquisition occurred. Alternatively, to the extent they joined later, they knowingly adopted their coconspirators' prior acts in furtherance of the Conspiracy, including those alleged in the preceding paragraph, and are liable for those acts.

358. Plaintiff further alleges on information and belief that Fox Corp., acting through Szew and/or Fried in their capacities as agents and/or representatives of Fox Corp. and/or Fox Studios, upon information and belief, participated in coordination with Cohen, Vesely, and Robbins no later than October 17, 2024 in scheduling the Cohen-arranged meeting with Robbins eight days before Option expiration—and at the moment of the Option's expiration, when Szew traveled to Vienna on expiration day. Fox Corp. thereby joined the Conspiracy at or before the moment OLF's renewal rights lapsed. Alternatively, to the extent Fox Corp. joined after expiration, it knowingly adopted its co-conspirators' prior acts in furtherance of the Conspiracy—including by continuing development, making false assurances to Polvino through Fried, and transmitting the Fox Breach Notice exploiting the diverted opportunity—and is jointly and severally liable for all resulting damages regardless of when it joined.





HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

359. Fox Studios, acting through Szew and/or Fried in their capacities as agents and/or representatives of Fox Studios and/or Fox Corp., joined the Conspiracy no later than October 17, 2024, when Szew coordinated scheduling of Cohen-arranged meeting with Robbins eight days before Option expiration. To the extent Fox Studios joined at a different point, it knowingly adopted its co-conspirators' prior acts in furtherance of the Conspiracy—including by facilitating the Vienna meeting on expiration day, making false assurances to Polvino through Fried, and transmitting the Fox Breach Notice exploiting the diverted opportunity—and is jointly and severally liable for all resulting damages regardless of when it joined.

360. MarVista joined the Conspiracy no later than September 25, 2024, when Savage confirmed awareness that OLF was the required contracting party for guild-covered writer engagements and thereafter facilitated placement of those engagements with a Cohen Entity—weeks before the October 10, 2024 call at which Cohen and Vesely formalized their internal agreement. Alternatively, to the extent MarVista joined at a later point, it knowingly adopted its co-conspirators' prior acts in furtherance of the Conspiracy—including by continuing development after written notice, making false assurances to Polvino through Fried, and supporting the structure the Fox Breach Notice was designed to advance—and is jointly and severally liable for all resulting damages regardless of when it joined.

361. Robbins, TR Productions, Fox Corp., Fox Studios, and MarVista are liable for the Underlying Wrongs regardless of whether they personally committed each act or knew every detail or participant in the Conspiracy. Robbins and TR Productions were capable of committing each Underlying Wrong: as joint venturers, they owed fiduciary duties to OLF and Polvino, and they were not parties to either the Agreement or the Option Agreement. Fox Corp. was capable of committing each Underlying Wrong: acting through MarVista as its direct or indirect subsidiary and through Szew and Fried as its agents and/or representatives—each of whom Plaintiff alleges acted on behalf of Fox Corp. and/or Fox Studios in the alternative—it

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

exercised actual control over development, financing, writer approvals, and production decisions related to the Project. Fox Corp. is not a party to the Option Agreement and its role in the Conspiracy does not arise from any direct contractual obligation to OLF. Fox Studios was capable of committing each Underlying Wrong: acting through Szew and Fried as its agents and/or representatives—each of whom Plaintiff alleges acted on behalf of Fox Studios and/or Fox Corp. in the alternative—it exercised direct influence over the Project's creative and business direction, participated in key meetings with the Frankl Estate and Robbins, and was positioned to facilitate or block the diversion of OLF's renewal opportunity. Plaintiff pleads Fox Corp. and Fox Studios in the alternative as to the scope of Szew's and Fried's authority and agency; the precise organizational relationship will be determined through discovery. MarVista was capable of committing each Underlying Wrong: it was a direct party to the Agreement, exercised approval rights over development decisions, negotiated writer agreements through Savage, and through Fried maintained direct communications with OLF and Polvino—giving it both the opportunity and the means to facilitate the diversion. Each of these defendants is liable regardless of whether any other defendant is found liable, because the Conspiracy involves multiple independent actors and the dismissal or exoneration of any one does not defeat the claims against the others.

362. As a direct and proximate result of the Conspiracy, OLF lost Development Funds, writer contracts, development assets, opportunities, and contractual economic benefits, while Polvino lost her producer credit, participation in creative and business decisions, and compensation and other economic benefits. Robbins, TR Productions, Fox Corp., Fox Studios, and MarVista are jointly and severally liable with Cohen, Vesely, and each other for all resulting damages, in an amount to be proven at trial.

363. Robbins, TR Productions, Fox Corp., Fox Studios, and MarVista acted with fraud, malice, and oppression by knowingly agreeing to and furthering the



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

diversion of OLF's rights, opportunities, and Project for their own benefit and to the exclusion of OLF and Polvino. Plaintiff therefore seeks punitive damages under California Civil Code section 3294.

**<u>NINETEENTH CAUSE OF ACTION</u>**

**Unfair Competition (Cal. Bus. & Prof. Code § 17200)**

**(By Polvino Derivatively on Behalf of OLF and Polvino Individually Against MarVista, Fox Studios, Fox Corp., and Cohen)**

364. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

365. Defendants engaged in unlawful business acts and practices by committing the violations of law alleged in the Causes of Action for Fraud; Aiding and Abetting Fraud; Breach of Fiduciary Duty; Aiding and Abetting Breach of Fiduciary Duty; Breach of Duty of Loyalty; Aiding and Abetting Breach of Duty of Loyalty; Intentional Interference with Contract; and Intentional Interference with Prospective Economic Advantage Causes, each of which independently constitutes an unlawful act under § 17200.

366. MarVista, Fox Studios, and Fox Corp. are each liable on this Count. On information and belief, the conduct of Fried and Szew underlying the unlawful business acts and practices alleged against them in this Count was undertaken on behalf of Fox Studios and Fox Corp.; in the alternative, on behalf of MarVista, or on behalf of all of them.

367. Separately, upon information and belief, Cohen engaged in conduct constituting a violation of California Penal Code § 115 as a result of her filing of fraudulent documents with the California Secretary of State, which constitutes a felony and an unlawful act under § 17200.

368. Polvino and OLF lost money or property as a result, including specific Development Funds, vested contractual and development rights, and money or





HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

property traceable to the challenged transactions, and as a result, an adequate remedy at law does not exist, entitling Plaintiff to restitution.

**TWENTIETH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(By Polvino Individually And Derivatively Against MarVista, Fox Studios, Fox Corp., and Cohen)**

369. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

370. MarVista, Fox Studios, Fox Corp., and Cohen each made material representations to Plaintiff, including without limitation: (i) Cohen's representations that she was managing OLF's assets and development activities in OLF's interest and within the scope of her authority as OLF's agent, including her representations regarding the engagement of writers, the disposition of the Development Funds, and the status of the Option renewal; (ii) MarVista's and Fox Corp.'s representations, through their agent Fried, on January 21, 2025, that from MarVista's and Fox Corp.'s perspective "everything is on hold" and they were "not engaged in discussions about any other matters on the project," and on January 28, 2025, that MarVista and Fox Corp. had not consented to the Project moving to a new entity or to any change in structure; and (iii) MarVista's and Fox Corp.'s representations, through their agent Szew's continued communications with Polvino—including correspondence following Szew's visit to the Frankl Estate on October 25–26, 2024—that the Project remained under active consideration through OLF. These representations were material and directed at Plaintiff.

371. The representations by MarVista, Fox Studios, Fox Corp., and Cohen described above were made without reasonable grounds for believing them to be true. At the time each representation was made, Defendants had information establishing, or that should have established, their falsity: development outside OLF had continued and the Project structure had changed, with new screenplay material being written and reviewed at the direction of Cohen, MarVista, and Fox Corp. in the name of





HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

entities other than OLF; the Development Funds had been or were being transferred to a Cohen Entity; and the Option renewal opportunity had been or was being redirected away from OLF. These representations were made carelessly, recklessly, unreasonably, and negligently to Plaintiff.

372. MarVista, Fox Corp., and Cohen made these representations with the intent to induce Plaintiff to rely on them — specifically, to cause Plaintiff to continue pursuing an internal resolution with Cohen, to refrain from taking independent action to protect OLF's contractual rights, option renewal rights, and Development Funds, and to continue dealing with MarVista and Fox Corp. as neutral parties pending resolution of the Cohen dispute.

373. Plaintiff was at no time aware that these representations were false or were made without reasonable grounds for believing them to be true. The facts establishing the falsity of those representations — including the continuation of development outside OLF, the status of the Development Funds, and Defendants' discussions with the Frankl Estate and potential replacement entities — were within Defendants' exclusive knowledge and control and were deliberately withheld from Plaintiff.

374. Plaintiff reasonably and justifiably relied on these misrepresentations. In reliance thereon, Plaintiff continued pursuing an internal resolution with Cohen while treating MarVista, Fox Studios, and Fox Corp. as neutral, refrained from taking independent steps to secure the Option renewal or protect OLF's rights against unauthorized transfer, and continued to engage in good faith with MarVista and Fox Corp.'s representatives. Plaintiff would not have taken, or refrained from taking, those actions had she known the true facts.

375. As a direct and proximate result of Plaintiff's reliance on Defendants' negligent misrepresentations, OLF was damaged in an amount to be proven at trial, including loss of the Development Funds transferred to a Cohen Entity; loss of OLF's Option renewal or replacement rights; loss of ownership and control of development

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

assets, including copyrightable materials created under OLF's direction; and loss of economic participation in the Picture.

376. Polvino has suffered separate injuries, including the loss of her contractual producer credit, exclusion from creative and business decisions concerning the Picture, and deprivation of compensation and economic benefits to which she was personally entitled, including her share of producing fees, deferred compensation, and contingent participation in the Picture.

377. OLF and Polvino have also incurred expenses investigating the diversion of Development Funds, contracts, and development assets, and taking steps to preserve their respective rights and interests in the Picture.

## TWENTY-FIRST CAUSE OF ACTION

**Reinstatement of OLF to Active Status (Cal. Gov. Code § 12261)**

**(By Polvino Individually Against Cohen and DOES 1 through 10)**

378. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as is fully stated herein.

379. OLF was a California limited liability company, duly organized under the laws of the State of California.

380. OLF was formed on or about May 12, 2022.

381. At all relevant times, Polvino was a member of OLF.

382. On or about May 13, 2025, a fraudulent Certificate of Cancellation was filed with the Secretary of State without the knowledge or consent of Polvino stating that all members of OLF agreed to dissolve OLF. Plaintiff is informed and believes, and on that basis alleges, that Cohen prepared and filed the fraudulent Certificate.

383. Polvino discovered that the fraudulent Certificate was filed on or about August 26, 2026.

384. The Certificate therefore contains statements that are materially and categorically false because Polvino did not vote or agree to dissolve OLF.



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

1. A Declaration that Defendants have infringed the copyrights in the Copyrighted Works;

2. For compensatory and consequential damages, in an amount according to proof at trial;

3. Treble damages pursuant to Penal Code § 496(c);

4. Punitive damages, in an amount not less than the amount recoverable under the law;

5. For actual copyright damages and infringer profits under 17 U.S.C. § 504(b);

6. For an Order reinstating OLF to active status pursuant to Government Code § 12261 on the grounds that the statements made in the Certificate of Cancellation are materially false and that the Certificate of Cancellation was fraudulently filed;

7. An Order preliminarily and permanently enjoining and restraining Defendants and their successors and assigns, and any persons or entities acting or purporting to act for or on behalf of any of the foregoing, including any agents, employees, representatives, officers, directors, servants, and partners, and those persons in active concert or participation with them, from manufacturing, producing, publishing, distributing, licensing, using, copying, reproducing, advertising, promoting, exhibiting, performing, displaying, offering for sale, selling or otherwise exploiting any of the Copyrighted Works, or any other work which is substantially similar thereto;

8. An Order preliminarily and permanently enjoining and restraining Defendants, their successors and assigns, and any persons or entities acting or purporting to act for or on behalf of any of the foregoing, including any agents,

employees, representatives, officers, directors, servants, and partners, and those persons in active concert or participation with them, from engaging in any acts of copyright infringement with respect to any of the Copyrighted Works;

9. An Order directing the seizure, delivery and destruction of each product or material within Defendants' possession, custody or control which infringes or otherwise violates OLF's exclusive rights in and to the Copyrighted Works, and of all materials used for the production of same;

10. An Order requiring Defendants to file with the Court and to serve on Plaintiff within 30 days after service of any preliminary injunction and/or permanent injunction issued herein, or within such reasonable time as the Court shall direct, a report in writing and under oath, setting forth in detail the manner in which Defendants have complied with such injunction;

11. An Order requiring the Defendants to account and pay over to Plaintiff all gains, profits, and advantages derived by them from the wrongful acts described in this verified Complaint;

12. An Order imposing a constructive trust on all monies, revenues, profits, and commercial advantages wrongfully received or retained as a result of the misconduct alleged herein, as well as all right, title, and interest in and to: (i) Viktor Frankl's book *Man's Search for Meaning*; (ii) any option agreements, option extension or renewal agreements, acquisition agreements, and motion-picture or ancillary rights agreements relating thereto; and (iii) the Project and Picture; and directing Defendants to immediately convey, assign, transfer, and deliver all such rights, agreements, assets, and traceable proceeds to OLF Productions, LLC, including executing all documents necessary to clear OLF's chain of title.

13. Attorneys' fees, costs, and expenses incurred in this action to the fullest extent permitted by law;

14. Pre-judgment and post-judgment interest on all recoverable damages at the highest legal rate from the earliest possible date;



HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

15. Additional statutory penalties as may be authorized by law; and

16. For such other and further relief as the Court deems just, equitable, or proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: October 25, 2026

**HUNTON ANDREWS KURTH LLP**

By: */s/ Jacob J. Struck, Esq.*

Jacob J. Struck, Esq.
Katherine P. Deegan, Esq.
Attorneys for Plaintiff
Marisa Polvino, individually and derivatively on behalf of OLF Productions, LLC

HUNTON ANDREWS KURTH LLP
550 SOUTH HOPE STREET, SUITE 2000
LOS ANGELES, CALIFORNIA 90071-2627

550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

**VERIFICATION**

I, MARISA POLVINO, hereby declare that I am the Plaintiff in this action and a member of Nominal Defendant OLF, and that I am duly authorized to verify the Verified Complaint for Damages and Injunctive Relief ("Verified Complaint"). I have read the foregoing Verified Complaint and know its contents. The factual allegations set forth are true and accurate to the best of my own knowledge except as to matters stated on information and belief, and as to those matters I believe them to be true. I make this verification for purposes of Federal Rule of Civil Procedure 23.1 and any other applicable requirement.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on this 25th day of October, 2026, at Los Angeles, California.

[signature]

MARISA POLVINO